Ralph **NATTRASS, et al., Appellant,**

v.

**ROSENTHAL AND COMPANY,**
**Appellee.**

**No. 2–81–035–CV.**

Court of Appeals of Texas,
Fort Worth.

Oct. 7, 1982.

Rehearing Denied Nov. 4, 1982.

Brown, Herman, Scott, Dean & Miles and Randall Schmidt, R. David Broiles, Fort Worth, for appellant.

Barlow, Gardner, Tucker & Garsek and Michael T. Watson, Fort Worth, for appellee.

Before MASSEY, C.J., and SPURLOCK and JORDAN, JJ.

## OPINION

MASSEY, Chief Justice.

Ralph Nattrass, George Panagopoulos, Dionysios Panagopoulos, Dennis Mouzakis,

and Betty Calame, plaintiffs, brought suit in district court seeking damages from their broker, Rosenthal & Company, based upon the failure of the latter, through its employee, Larkin, to follow plaintiffs' instructions to take them out of the commodities market. Following trial to a jury, the trial court on September 21, 1981, rendered judgment in favor of plaintiffs, the broker's customers, for $36,745.00 plus attorney's fees. Although they obtained a favorable judgment, all of them have appealed. They present, as their principal contention, that the trial court erred in submitting to the jury a damages issue and rendering judgment thereon when the amount of damages prayed for (totaling $76,712.00) was uncontradicted and admitted. The broker has also perfected its own appeal in the contention, primarily, that Texas State courts have no jurisdiction to hear disputes in the commodities trading field when there exists an extensive federal regulatory scheme; that provision therefor has preempted and foreclosed State court jurisdiction.

Judgment is reformed as to amount so as to conform to that for which the plaintiffs sued, and, as so reformed, is affirmed.

In October, 1976, plaintiffs purchased September 1977 Brazilian coffee options through the London Commodity Exchange. Rosenthal & Company, a Chicago-based broker with a branch office in Fort Worth, procured the options for the plaintiffs' accounts through the efforts of its agent, Chris Larkin, personal broker for plaintiffs. Each option had a "striking price" at which plaintiffs could exercise their options. Only upon the exercise of an option are traders like plaintiffs obligated to take physical delivery of a commodity under the contract underlying each option. If market price for September 1977 coffee rose above the price at which an option holder could exercise, the holder could exercise at his low price and resell his contracts for delivery at the higher market value. In this case, the plaintiffs held nineteen options purchased at prices varying between 1925 British pounds sterling and 2010 pounds per ton. (Options and contracts for commodities are expressed in per ton prices, but each option or contract represents five tons of any certain commodity.) These plaintiffs, owning options for 95 metric tons of coffee, had upwards of $200,000.00 invested in September 1977 options. They collectively saw their profit potential in coffee climb fortuitously because of unexpected climatic conditions in Brazil during the winter of 1976–77. As a result of the hardships facing Brazilian growers and coffee suppliers, the value of plaintiffs' options increased approximately 100%. Traders were willing to pay 4000 pounds per ton for Brazilian coffee available for delivery in September, 1977.

The plaintiffs were all acquainted with one another. The Panagopoulos clan operated Mr. Nattrass' favorite restaurant and meeting place in Arlington. Dennis Mouzakis is related by marriage to Nattrass. Betty Calame worked for Nattrass' retail mobile home firm. All were account holders with Rosenthal & Company, but Nattrass would instruct the broker concerning transactions in Calame's account, George Panagopoulos would speak for Dionysios Panagopoulos, and Dennis Mouzakis for the most part would instruct Rosenthal concerning his own account. Nattrass, however, was apparently the moving force in the trading circle, but he professed having limited knowledge of the often confusing mechanics of the commodities market. Nattrass was the first plaintiff solicited by Chris Larkin to set up an account with Rosenthal. Each plaintiff followed suit at the behest of Nattrass, and each traded in other commodities with resultant successes and failures.

The events of late April, 1977, become crucial to this case. Plaintiffs had been advised that they would be required to hold on to their options for six months in order to receive more favorable tax treatment for long-term capital gains. A meeting with Larkin was arranged for Friday, April 22nd. At this meeting, (Larkin, Nattrass, George Panagopoulos, and Mouzakis all being present) Larkin was instructed that April 23rd was the first day after six months at which the desired tax treatment could be obtained, and that he should get

the plaintiffs out of the market as soon as possible after that date because of rapidly decreasing prices for September 1977 coffee.

On April 27th, seemingly during the first trading week for their capital gains purposes, Larkin took one step toward the plaintiffs' goal of leaving the volatile market. He sold nineteen contracts for September 1977 coffee to some unknown trader. This obligated each plaintiff to physically deliver 95 tons of coffee to the trader in September, 1977. At this point, the plaintiffs actually did not have the coffee to satisfy their obligations, but it would have been a simple enough procedure for Larkin to procure the coffee contracts by exercising the nineteen options held collectively by the plaintiffs. Had Larkin performed this second step, he would have been exercising options at a price of approximately 2000 British pounds per ton to satisfy the contracts sold to the unknown trader at 3800 pounds.

Instead of exercising the options, Larkin simply bought nineteen contracts for the plaintiffs at a price of 3700 pounds per metric ton in order to satisfy the plaintiffs' commitment to the unknown trader. The result was a short-swing profit of 100 pounds per ton, or a total of 9500 pounds collective profit for the plaintiffs' accounts. The options purchased in October, 1976, remained unexercised in a market that was plummeting. Finally, on May 4th, Larkin did as instructed and got the plaintiffs out of the market by selling contracts to a trader for either 3290 or 3300 pounds, satisfying them with the contracts underlying the plaintiffs' options by exercising the same. Once again, the plaintiffs made substantial profits, some 1300 pounds per ton. They were, however, dissatisfied with Larkin's trading for their accounts. They felt they could have made an additional 400 pounds profit per ton of coffee had he exercised their October options to accomplish a sale on April 27th.

Plaintiffs' suit was filed in order to recoup the difference between 3700 and 3300 British pounds. This was the amount, in the opinion of plaintiffs, which was lost due to Larkin's unauthorized trading, which had left their options unexercised for over a week. In other words they sued for the amount in excess of that received, which they would have realized had Larkin "taken them out of the market" at the time he was instructed.

Trial was to a jury, which found that plaintiffs instructed Larkin to take them out of the market after April 23, 1977. It found that Larkin failed to follow these instructions. It found that none of the plaintiffs had waived their rights to assert that Rosenthal had entered into an unauthorized transaction, and that none had ratified Rosenthal's purchase of coffee futures after April 23, 1977. The jury also found that financial loss was suffered by the plaintiffs as a result of the events complained of. Submitted over objection by plaintiffs was a special issue in answer to which the jury found that $35,745.00 (collectively grouped here) was the amount of plaintiffs' damages.

## JURISDICTION OF THE DISTRICT COURT

Rosenthal & Company contends that it was error for the district court to take jurisdiction of the claims of plaintiffs Nattrass, et al. The claims, failure to follow instructions, breach of fiduciary duty, supplying false information, negligence, gross negligence, and misrepresentation of services in violation of Tex.Bus. & Comm.Code secs. 17.46(b)(5)(7) & (21), and 17.50(a)(1)(2) & (3) (the Texas Deceptive Trade Practices—Consumer Protection Act) (Supp. 1982), being based solely on the common and statutory law of Texas, are contended by Rosenthal & Company to be in conflict with the Commodity Exchange Act, 7 U.S. C.A. sec. 1, et seq. (1980). Proposed by the broker is that Texas state courts lack jurisdiction to adjudicate private damage claims because Congress intended that the Commodity Exchange Act, through the Commodity Futures Trading Commission, should exclusively govern the trading of commodity options. Represented is that

Texas courts as well as those of other states have recognized the exclusive jurisdiction of the federal regulatory and reparation scheme over claims arising from the trading of commodity options.

Texas decisions cited by Rosenthal & Company are not on point. In *State v. Monex International, Limited,* 527 S.W.2d 804 (Tex.Civ.App.—Eastland 1975, writ ref'd.), the State of Texas sought to enjoin certain commodity transactions which did not comply with the registration requirements of the Texas Securities Act, Tex.Rev. Civ.Stat.Ann. art. 581–1 through 581–39 (1964). The trial court refused to enter the requested injunction. The Court of Civil Appeals, in affirming the trial court's action, stated:

"We think it is clear that the newly established Commodity Futures Trading Commission now has exclusive jurisdiction to regulate Pacific's margin account sales. *Hines v. Davidowitz,* 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581 (1940); *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 67 S.Ct. 1146, 91 L.Ed. 1447 (1946); See also: Conference Report Commodity Futures Trading Commission Act of 1974, S.Rep. No. 93–1194, 93rd Cong. 2nd Series 35–36, 3 U.S.Code Cong. and Admin.News, p. 5897." *State v. Monex, International, supra,* at 806.

The state, in the cited case, was attempting to regulate commodity transactions, with no private damage claims being adjudicated.

Equally dissimilar is the case of *Clayton Brokerage Co., Etc. v. Mouer,* 531 S.W.2d 805 (Tex.1975). There, in a suit by the State of Texas, through the Commissioner of Securities, the trial court had enjoined a dealer of commodity options from selling in violation of the Texas Securities Act. The Court of Civil Appeals affirmed, 520 S.W.2d 802, and in the Supreme Court the broker's application for writ of error was given the notation, "refused, no reversible error." Upon motion for rehearing, the Texas Supreme Court, pursuant to Tex.R.Civ.P. 483, "Orders on Application for Writ of Error, etc.", granted the broker's motion to dismiss the cause as moot because of its outright refusal of application for writ of error in *State v. Monex International, supra.* The two cited cases represent the law of this State for the issues therein decided.

In *Singer v. Clayton Brokerage Co., Etc.,* 620 S.W.2d 720 (Tex.Civ.App.—Dallas 1981, writ ref'd n.r.e.), the Dallas court addressed the issue. Singer, a plaintiff in position like unto that of the plaintiffs in this case, brought an action against his commodities broker for misrepresentation and deceptive trade practices. In a plea in abatement, the defendants asserted that the Commodity Futures Trading Commission had either exclusive or primary jurisdiction concerning disputes over commodity futures contracts and damages arising in the trade of such contracts, and that private complainants must have exhausted administrative remedies prior to commencing suit in state court. The trial court sustained the plea and dismissed Singer's action when he chose not to initiate reparation proceedings before the Futures Commission. For reasons aptly expressed, the Court of Civil Appeals reversed and remanded the case for trial on the merits.

Because plaintiffs in this case have nowhere claimed that Rosenthal & Company violated the Commodity Exchange Act, this court, like the Dallas court in *Singer,* is not concerned with the preemption of Texas substantive law by substantive federal law; rather, "(o)ur concern in this case is whether the federal statute, by its terms, deprives the state courts of jurisdiction, . . ." *Singer, supra,* at 723.

Rosenthal places great emphasis on the language of the Commodity Exchange Act, 7 U.S.C.A. sec. 2 (1980), which grants to the Commodity Futures Trading Commission the "exclusive jurisdiction with respect to accounts, agreements (including any transaction which is . . . an option), and transactions involving contracts of sale of a commodity for future delivery", in support of its contention that the district court erred in its failure to dismiss plaintiffs' suit. We perceive no error. Within the quoted section of the act is the explicit provision that

"nothing contained in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State."

Rosenthal & Company cites us to *Rivers v. Rosenthal & Co.,* 634 F.2d 774 (5th Cir. 1980), where that court held the quoted language to mean that, rather than saving a private cause of action under the Commodity Exchange Act, Congress intended to provide that the courts would be available for review of the administrative reparations proceeding and subsequent enforcement of awards. However, quite recently, the Supreme Court of the United States affirmed decisions by the Second and Sixth Circuit Courts of Appeals which held contrary to the Fifth Circuit in *Rivers*. In *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* —— U.S. ——, 102 S.Ct. 1825, 72 L.Ed. 182 (1982), the court held that private causes of action under the Commodity Exchange Act, which were available to private investors prior to 1974, survived the amendments of that year which created the Commodity Futures Trading Commission. *See id.* at ——, 102 S.Ct. at 1844, 72 L.Ed. at 207. This decision, as well as *Singer v. Clayton Brokerage Co., supra,* warrants our holding that there was propriety in the district court's exercise of jurisdiction.

## DAMAGES

■ Asserted by plaintiffs is that the task of calculating their lost profits was for the court, not for the jury, and that the trial court erred in basing judgment amounts on the jury's findings. They contend the trial court erred in submitting Special Issue No. 4 over their timely objection because the measure and amount of damages was established as a matter of law to be in conformity with those alleged in their petition. Also urged as error is the trial court's refusal to disregard the jury's answers to Special Issue No. 4 when motion was made for judgment n.o.v. under Tex.R. Civ.P. 301 [1], "Judgments".

1. Tex.R.Civ.P. 301 "Judgments", insofar as it concerns the case at bar, provides "that upon motion and reasonable notice the court may render judgment non obstante veredicto if a

The aforesaid issue, and the several answers thereto, read as follows: (for purposes of reference the amounts shown in brackets were the amounts pleaded)

"QUESTION NO. 4—

What sum of money, if any, if paid now in cash, would compensate plaintiffs, or any of them, for their losses, if any, caused by the failure of Chris Larkin to follow their instructions, if he did?

Answer in dollars and cents, if any, as to each:

| | | |
|---|---|---|
| Ralph Nattrass ......:. | $ 9,828.00 | ($21,500.00) |
| Dionysios Panagopoulos and George Panagopoulos ...... (Joint account)...... | $ 6,552.00 | ($14,104.00) |
| George Panagopoulos .. | $ 8,190.00 | ($17,630.00) |
| Dennis Mouzakis ...... | $ 3,276.00 | ($ 7,052.00) |
| Betty Calame ........ | $ 7,899.00" | ($16,426.00) |

The testimony of Donald Braverman, limited partner of Rosenthal & Company, was the only relatively clear testimony offered by either party to establish a method whereby damages could be calculated, and it is cited by plaintiffs in support of a four-step equation used by them to arrive at their pleaded damages:

Calculation of Damages:

I. (Price at which each plaintiff's coffee option was at risk because of Rosenthal's failure to follow instructions) *minus* (Price at which the risk of loss was stopped) *equals* Loss per ton of coffee.

II. (Loss per ton of coffee) *multiplied by* 5 (each contract representing 5 metric tons of coffee) *equals* Loss per contract.

III. (Loss per contract) *multiplied by* (Number of options held by each plaintiff) *equals* Total loss in British pounds sterling per plaintiff.

IV. (Total loss per plaintiff) *multiplied by* 1.72 (the stipulated exchange rate) *equals* The total dollar loss per plaintiff.

directed verdict would have been proper, and ... the court may ... disregard any Special Issue that has no support in the evidence ..."

An example: the situation applicable to the damages of plaintiff Dennis Mouzakis. On April 27, 1977, Rosenthal sold two contracts by which Mouzakis was obligated to deliver to the purchaser ten tons (five tons per contract) of Brazilian coffee in September, 1977, at a price of 3800 British pounds. Immediately thereafter Rosenthal bought for Mouzakis ten tons (two five-ton contracts) of September 1977 coffee with which Mouzakis could fulfill this obligation. The result was a 100 pound profit per ton of coffee. However, Mouzakis, in October, 1976, had purchased his options at a price of 2002 British pounds sterling (termed his "striking price") and on April 27, 1977, his options remained unexercised and at risk in the market. The jury found that Mouzakis had instructed Rosenthal to take him out of the market after April 23, 1977. Subsequent thereto, the market in London for September 1977 coffee began a sharp decline. On May 4, 1977, when the broker finally performed as instructed, the broker sold two contracts to another purchaser at 3290 pounds with the result that Mouzakis was obligated to deliver ten tons of Brazilian coffee in September 1977; and then the broker exercised Mouzakis' options at his striking price of 2002 pounds in order to fulfill his obligation at 3290 pounds. Obviously the result would properly show entitlement to a substantial profit for Mouzakis, some 12,980 British pounds.

Rosenthal asserts that Mouzakis has no complaint; that it, as his broker, obviously generated an enormous profit on his behalf. Mouzakis, his profits notwithstanding, claims otherwise. The gist of his complaint and the basis of his suit was this: On April 27, 1977 (and not on May 4th following), Rosenthal should have heeded his instructions by (1) selling two contracts to the first unknown trader (which Rosenthal did in fact do), and (2) by then exercising his options at 2002 British pounds sterling (which Rosenthal failed to do). Mouzakis knew then as well as now that his options were exercisable on April 27th. Two contracts were sold for his account on that day, and he could have fulfilled them with the underlying contracts that ensue when options are exercised. Put in the context of the four-prong equation, we have shown, above, Mouzakis' profits should have been:

I. 3700 British pounds (3800 pounds *minus* the short swing 100 pound per ton profit actually realized on April 27th) *minus* 3290 (price at which risk of loss was stopped although profit did occur) *equals* 410 pounds loss per ton of coffee.

II. 410 British pounds *multiplied by* 5 (tons per contract) *equals* 2050 pounds lost per contract.

III. 2050 British pounds *multiplied by* 2 (number of options held) *equals* 4100 pounds lost.

IV. 4100 *multiplied by* 1.72 (British pounds per dollar) *equals* $7052.00 (the total of lost profits).

The testimony and evidence showed that on April 27, 1977, Rosenthal's agent, Chris Larkin, followed the same course of trading for each plaintiffs' account (as illustrated above by the account of Dennis Mouzakis). The trading involved a sale of the same number of futures contracts for September 1977 coffee as each plaintiff held options. These sales committed each plaintiff to deliver to purchasers an amount of coffee equal to the contracts' terms, and the sales should have locked in the profits to which each plaintiff should have earned (if Rosenthal had then exercised, at a low striking price, their options purchased in October, 1976). Therefore, we know that Rosenthal secured purchasers of coffee who paid 3800 British pounds sterling for the exact number of contracts the plaintiffs could have fulfilled with their options and the underlying contracts. The fact that 100 British pounds profit per ton was made for each plaintiff is of little import; the amount is of importance only as a credit upon their lost profits which would be justifiably recoverable from Rosenthal & Company.

In reply, Rosenthal claims a picture of the case has been painted by plaintiffs which totally ignores all of its defensive theories as the broker. Rosenthal refers to its pre-trial brief, which set out a method

for calculation of damages, mirroring exactly the one claimed here by plaintiffs to be uncontroverted, as an admission of that method only insofar all elements of the plaintiff's case were proven conclusively and found conclusively by the jury, *and further only in the event no defensive theories were found to be viable.*

No defensive issues submitted to the jury were answered favorably to Rosenthal. Each controlling element of the plaintiffs' case was submitted to the jury. Each inquiry submitted, with the exception of one, was answered in favor of the plaintiffs. Because that is so the Rosenthal argument substantially supports the position of plaintiffs. The sole issue that was found against plaintiffs was that in denial of their theory of recovery by provisions of the Texas Deceptive Trade Practices—Consumer Protection Act, Tex.Bus. & Comm.Code, sec. 17.46 "Deceptive Trade Practice Unlawful" (Supp.1982). Plaintiffs have abandoned this theory; yet they are entitled to recover damages by the measure we have discussed.

Further contended by Rosenthal is that the jury's answers to Special Issue No. 4 were consistent with the theory that each plaintiff knew they were still at risk in the market after April 25th, but that each chose instead to "ride" the market and gamble on the chance that September coffee prices would go up. Although Rosenthal's defensive theories were submitted to the jury and answered unfavorably, the broker asserts that the jury must have concluded that another theory not submitted, that of mitigation of damages, was viable and that the jury utilized this mitigation theory in arriving at their answer to Special Issue No. 4. Cited is the testimony of Richard Mortel, a general partner with Rosenthal & Company, to the effect that any reasonable customer in a position that these plaintiffs claimed to be in should have come forward to cut their losses after they had learned of Larkin's unauthorized acts for their accounts. Also cited is the testimony of Chris Larkin to the effect that no complaint was made by plaintiffs when they were informed he had reinserted them into the volatile market. Such testimony was obviously offered in support of Rosenthal's defenses of waiver and ratification. Having failed to persuade the jury Rosenthal can realize no benefit by these defenses.

We hold that once liability was established on the part of the broker, the calculation and amount of damages to be awarded to the plaintiffs was not a matter of guesswork or speculation and it was not a matter determinable as matter of fact by the jury. The difference between 3800 British pounds sterling (the price at which willing traders did purchase contracts under the plaintiffs accounts) and the price at which the plaintiffs' options were exercised as instructed, less the 100 pound per ton short swing profit made for each plaintiffs account, was, under the evidence, the exclusive method of calculating plaintiffs' damages in this case. Special Issue No. 4 was immaterial when submitted and should have been disregarded upon proper motion under Rule 301. *H.S. Tennell v. Esteve Cotton Co.,* 546 S.W.2d 346, 357 (Tex.Civ.App.—Amarillo 1976, writ ref'd. n.r.e.); *Crawford Chevrolet, Inc. v. McLarty,* 519 S.W.2d 656, 662 (Tex.Civ.App.—Amarillo 1975, no writ).

The judgment for damages due each plaintiff should have been those following:

| Ralph Nattrass | $ 21,500.00 |
| Dionysios & George Panagopoulos | 14,104.00 |
| George Panagopoulos | 17,630.00 |
| Dennis Mouzakis | 7,052.00 |
| Betty Calame | 16,426.00 |

### PREJUDGMENT INTEREST

In another point of error, plaintiffs Nattrass, et al., contend the trial court erred in failing to award prejudgment interest on the damages awarded to them.

The Texas prejudgment interest statute, V.A.C.S., art. 5069–1.03 (1971), provides for interest at the rate of six percent on "all written contracts ascertaining the sum payable, from and after the time when the sum is due and payable . . ." The written contract in this case is the agreement of Rosenthal & Company to follow instructions in managing the accounts of plaintiffs. As

found by the jury, Rosenthal failed to follow instructions.

■ In their amended petition, plaintiffs prayed, *inter alia,* for "interest on their damages as provided by law, ... and all such other and further relief, both equitable and general, to which they may show themselves justly entitled." Aside from the question of the plaintiffs' entitlement to prejudgment interest under art. 5069–1.02, Rosenthal contends there is no pleading by plaintiffs to support its award. We hold the pleadings sufficient. *Arkansas Louisiana Gas Co. v. Allison,* 620 S.W.2d 207, 212 (Tex.Civ.App.—Tyler), *reformed at* 624 S.W.2d 566 (Tex.1981); *Trinity River Auth. of Texas v. Sealy & Smith Foundation,* 435 S.W.2d 864, 865 (Tex.Civ.App.—Beaumont 1968, writ ref'd).

In support of their contention of entitlement under the law to an award of prejudgment interest, plaintiffs assert that simple reference to the stipulated records reflecting the transactions in each plaintiff's account supplies this court with a point in time at which plaintiffs' losses were established. For all plaintiffs except Betty Calame the date would be May 4, 1977, the date on which Rosenthal stopped the losses resulting from Larkin's failure to exercise plaintiffs' options to satisfy contracts sold for each account on April 27th. For Betty Calame the date would be July 29, 1977, the date on which Rosenthal "shorted" against her options (as has been done for the other plaintiffs on May 4, 1977).

■ The test for determining whether prejudgment interest may be awarded is whether or not the measure of recovery, not the measure of damages, is fixed by conditions existing at the time of injury. *Black Lake Pipe Line Co. v. Union Const. Co.,* 538 S.W.2d 80, 95–96 (Tex.1976); *First City Nat. Bank of Paris v. Haynes,* 614 S.W.2d 605, 610 (Tex.Civ.App.—Texarkana 1981, no writ). A date must be established.

Rosenthal contends that the amount of damages could have fluctuated between zero and $68,000.00, and that therefore no date has been established as that by which damages owing to plaintiffs could be measured.

We disagree. It is undisputed that Rosenthal sold contracts on April 27, 1977, committing each plaintiff to deliver coffee in amounts which mirrored exactly the amount underlying their options which could have been exercised. The jury's answers to liability inquiries leaves no doubt that this was the date upon which Rosenthal's conduct damaged (or began the damage to) plaintiffs. By our judgment we should award prejudgment interest for all plaintiffs except Calame to date of judgment (September 21, 1981) from and after June 5, 1977. We should award plaintiff Calame interest to date of judgment from and after September 1, 1977.

## EVIDENCE OF MOTIVE, ABANDONED COUNTERCLAIMS, AND OTHER TRANSACTIONS

In three other points of error, Rosenthal contends the trial court erred in admitting evidence which, in its view, was irrelevant to the cause and prejudicial to its defenses. We overrule all three points.

■ First, Rosenthal complains of the plaintiffs' actions in eliciting testimony on the motives of Chris Larkin in not exercising plaintiffs' options on April 27, 1977, when he had committed them to a like number of contracts for delivery which could have been fulfilled with the contracts underlying their options. The complaint concerns the cross-examination of Donald Braverman, a partner with Rosenthal called during the plaintiffs' case in chief. Braverman was perusing plaintiffs' account statements which showed the transactions that had occurred in each account. He stated that the statements indicated the plaintiffs simply accepted their position of risk and held back on a decision to exercise their options.

Faced with a witness who freely formed an opinion of the motives of the plaintiffs, their counsel chose to ask Braverman whether or not it was equally possible that the reason Larkin didn't carry through with

their instructions was because he, Larkin, was himself playing the market and hoping it would return to 3800 British pounds per ton so he could recoup losses in their accounts. Plaintiff Nattrass had already testified that they had all desired to be taken out of the market; Braverman testified that he was of the opinion that Nattrass had other desires inconsistent with his testimony. Nattrass could have been recalled to refute Braverman's assignment of different motives, but it was not necessary when Braverman candidly admitted the plaintiffs' theory was equally possible. If there was error, it was invited. *See Allen v. Compton,* 461 S.W.2d 143, 147 (Tex.Civ. App.—Dallas 1970, no writ), and cases collected therein.

 Second, Rosenthal contends it was error when the trial court allowed the plaintiffs to introduce evidence of Rosenthal's abandoned counterclaim against plaintiffs. The trial court initially allowed such references but, reconsidering, instructed the jury that all references thereto were stricken (i.e., excluded as matter the jury might take into consideration). Rosenthal pursued its objection that this evidence of irrelevant fact (that it had at one time presented a substantial counterclaim) was so prejudicial that the trial court should have taken special steps to prevent plaintiffs from making reference to the fact. At no time was there a motion for declaring a mistrial. Absent any Rosenthal motion for mistrial, error, if any, was waived. *Hammon v. Texas & New Orleans Railroad Company,* 382 S.W.2d 155, 161 (Tex.Civ.App.—Tyler, 1964, writ ref'd. n.r.e.), *cert. denied,* 382 U.S. 832, 86 S.Ct. 73, 15 L.Ed.2d 76 (1965).

 Finally, Rosenthal contends it was error for the trial court to admit into evidence plaintiffs' Exhibits 39A, 39B, 39C, and 39D, which refer to commodity transactions in the plaintiffs' account other than those dealing with September 1977 coffee. Rosenthal's primary complaint is that the commissions earned by Chris Larkin as a result of his handling of plaintiffs' accounts appear on the exhibits, and that this could do nothing except confuse and prejudice the jury in favor of the plaintiffs.

Error, if any, was invited. The commissions earned by Larkin on commodity transactions other than those made the basis of the suit by plaintiffs would not tend to prove or disprove a material fact in this case, yet the fact had been earlier elicited by Rosenthal that Larkin only earned small amounts in commissions from the transactions here involved. Although plaintiffs introduced documents by which apparent irrelevant transactions appeared, and thereafter gained admissions by Rosenthal that Larkin received a substantial percentage of his income from the overall trading he undertook in their accounts, the plaintiffs' exhibits were only conditionally relevant. They dealt with all of their transactions, not just those concerning September 1977 coffee. Larkin, in his own subsequent testimony, stated that the plaintiffs were continually bothering him about their accounts, and that he was forever having to go to Arlington to deal with them over trivial matters. The documents, already admitted, (Exhibits 39A–D), became relevant at this point, if not relevant earlier.

The judgment of the trial court is reformed, and as reformed is affirmed, the judgment hereby rendered reading as follows:

Plaintiff Ralph Nattrass is awarded judgment as against defendant Rosenthal & Company for his damages in the amount of $21,500.00, plus interest thereon at 6% per annum from June 5, 1977 to September 21, 1981, plus legal interest thereon, on both the amount of damages and the prejudgment interest, from the date of judgment, September 21, 1981.

Plaintiffs Dionysios and George Panagopoulos for their joint account are awarded judgment as against Rosenthal & Company for their damages in the amount of $14,104.00, plus interest thereon at 6% per annum from June 5, 1977 to September 21, 1981, plus legal interest thereon, on both the amount of damages and the prejudgment interest, from September 21, 1981.

Plaintiff George Panagopoulos individually is awarded judgment as against Rosen-

thal & Company for his damages in the amount of $17,630.00, plus interest thereon at 6% per annum from June 5, 1977 to September 21, 1981, plus legal interest thereon, on both the amount of damages and the prejudgment interest, from September 21, 1981.

Plaintiff Dennis Mouzakis is awarded judgment as against Rosenthal & Company for his damages in the amount of $7,052.00, plus interest thereon at 6% per annum from June 5, 1977 to September 21, 1981, plus legal interest thereon, on both the amount of damages and the prejudgment interest, from September 21, 1981.

Plaintiff Betty Calame is awarded judgment as against Rosenthal & Company for her damages in the amount of $16,426.00, plus interest thereon at 6% per annum from September 1, 1977 to September 21, 1981, plus legal interest thereon, on both the amount of damages and the prejudgment interest, from September 21, 1981.