**MAGNUM CORPORATION, William Rice, and David F. Ferrell, Plaintiffs-Appellees Cross-Appellants,**

**v.**

**LEHMAN BROTHERS KUHN LOEB, INC., Defendant-Appellant Cross-Appellee.**

No. 85–2511.

United States Court of Appeals, Fifth Circuit.

July 14, 1986.

Will Montgomery, William D. Sims, Jr., Dallas, Tex., for defendant-appellant, cross-appellee.

---

John M. Smith, George Piazza, Longview, Tex., for plaintiffs-appellees, cross-appellants.

Before BROWN, REAVLEY and JONES, Circuit Judges.

REAVLEY, Circuit Judge:

A stockbroker took orders from plaintiffs to buy stock at a time when it was trading in the over the counter market at $13.375.[1] The conditions of the market affecting price changed significantly after the time when the first order was placed, but the plaintiffs were not informed of those new conditions. Seven days after the first orders were made, all of plaintiffs' orders were filled at a price of $15.75. Plaintiffs sued for the difference in those two prices, and the district court awarded damages on that basis. We affirm.

Richard Stoyeck was a broker employed by Lehman Brothers Kuhn Loeb, Inc. (Lehman) in the New York headquarters office. In 1979 Stoyeck made a successful cold call to one of the plaintiffs in East Texas. Thereafter numerous transactions were conducted through telephone conversations between Stoyeck and the plaintiffs. On October 9, 1980 Stoyeck called one of the plaintiffs to recommend purchases of stock in RPM, Inc. (RPM). Orders were placed and filled on that date at a price of $14.50 a share and, again, on the following day at $13.25. Stoyeck called to seek further orders of the RPM stock on Friday, October 17, and plaintiffs were then persuaded to place purchase orders for 12,000 shares. The following Monday, October 20, plaintiffs ordered an additional 20,000 shares. These were all market orders, that is, orders to buy a stated amount of the security at the most advantageous price obtainable. No price or time limitation was placed on the orders. The closing market reports for both days, October 17 and 20, showed RPM at $13.50 asked and $13.25 bid. On October 17, 57,500 shares of RPM stock were traded nationally, of which Lehman purchased 30,000 shares. On October 20 only 20,500 shares were traded nationally of which approximately half was purchased by Lehman. Lehman had accumulated, however, on the 17th a large backlog of purchase orders. Stoyeck himself was successful in obtaining orders for 82,900 shares, and he has estimated that in the following week he obtained orders for as much as an additional 42,000 shares.

At the outset of business on Monday the 20th, Stoyeck was informed by his superiors that on the following day Lehman would become a "market maker" in RPM stock; that is, Lehman would buy and sell the stock for its own account. This decision is explained as the preferable method of handling the imbalance between buy and sell orders in an over the counter market of limited volume. To seek sellers at once for the quantity of stock desired would have meant a large escalation of the prevailing market price before those orders could have been filled. Lehman explains that its decision to make a market in the RPM stock meant better executions for its customers. However, its managing director, William Welsh, testified that under Lehman rules it is necessary to inform the customer whether Lehman is acting as agent or as a market maker, and that the broker cannot become a principal in a transaction until after it has completed whatever agency orders it has in hand. He explained that it is the responsibility of the trader, the employee in Stoyeck's position, to inform the customer in this respect. The head of the over the counter department at Lehman, Arthur Weigner, likewise testified that it is not permissible to act as agent and principal at the same time for the same customer. Nevertheless, nothing of the change in Lehman's position was disclosed to the plaintiffs, even though it was known to Stoyeck when the order for 20,000 shares was placed with him on Monday, the 20th.

1. This figure is the average of the closing bid and asked prices when the orders were placed.

Plaintiffs received no word from Lehman, after placing their orders, until the confirmation forms arrived in the mail revealing that the orders had been filled at a price of $15.75 on Friday, October 24.

On Tuesday, October 21, Lehman performed both as an agent (buying for its customers 5400 shares at $14.25) and as a market maker (buying for its own account 3500 shares at $14.00 and 20,000 shares at $14.25). The volume of RPM shares traded that day rose to 109,300. On Wednesday Lehman performed agency transactions for some of its customers (buying 9200 shares at prices ranging from $15.00 to $15.75), and Lehman accumulated more shares for its own account (14,500 at $15.25; 5000 at $15.50; 19,400 at $15.75). The total volume of RPM stock traded on Wednesday was 125,700 shares. On Thursday Lehman made no purchases of RPM stock, following the usual procedure of allowing the market to find its level. The nationwide volume slowed to 79,500 shares.

On Friday the 24th, Lehman bought for its own account another 26,750 shares at prices ranging from $15.00 to $15.25, thereby bringing its inventory to over 89,000 shares. It then sold 88,900 shares to customers, including the plaintiffs, for $15.75 per share. It had accumulated this stock at a weighted average price of approximately $15.10 per share.

During the following week, when plaintiffs received their confirmation slips, RPM closed no higher than $13.75 per share. Because they were being charged a price for the stock which amounted to over $2.00 per share above what they had expected to pay, the plaintiffs complained to Lehman, but without success.

This action was originally brought in state court but was removed by Lehman to the federal district court. After a one day bench trial, the court found Lehman negligent because it failed "to inform Plaintiffs as to the decision that [it] was becoming a market-maker in RPM stock and that this would cause a foreseeable delay in the execution of their orders." The court also found that these failings, along with Lehman's failure to execute the orders "as fully and promptly as possible," amounted to a breach of fiduciary duty. The court awarded the plaintiffs $76,000 in damages, being the difference between what the plaintiffs actually paid ($15.75) and what they should have paid ($13.375) (32,000 shares times $2.375 gives $76,000).

■■■ The relationship between a securities broker and its customer is that of principal and agent, *see, e.g., Robinson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 337 F.Supp. 107, 110 (N.D.Ala.1971), aff'd, 453 F.2d 417 (5th Cir.1972), and "[t]he relationship between agent and principal is a fiduciary relationship," *West v. Touchstone*, 620 S.W.2d 687, 690 (Tex.Civ. App.—Dallas 1981, writ ref'd n.r.e.) (citing Restatement (Second) of Agency § 1 (1958)). The implicit agreement between customer and stockbroker is that the latter will use reasonable efforts to execute the order promptly at the best obtainable price. The law imposes upon the broker the duty to disclose to the customer information that is material and relevant to the order. *See Kinzbach Tool Co., Inc. v. Corbett-Wallace Corp.*, 138 Tex. 565, 160 S.W.2d 509, 513 (1942); Restatement (Second) of Agency § 381 (1958). In *Carl J. Bleidung*, 38 S.E.C. 518, 521 (1958), the Securities and Exchange Commission stated that "trade custom requires a dealer to consummate transactions with customers promptly and to charge prices that are reasonably related to the prevailing market price." In *Bateman Eichler, Hill Richards, Inc.*, [1981–82 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 83,088, at 84,797 (Jan. 8, 1982) the Commission stated that when a dealer accepts a market order from a customer, "it must make every reasonable effort to execute ... promptly and fully." And then it explained at 84,798:

It is axiomatic that when a customer orders a security at market, he must bear the risk of an increase in the market price between the time he places the order and the time the dealer executes it. We recognize that, in situations such as this, customers may have to pay far

more for stock than they reasonably anticipated when they ordered it. However, the dealer may ameliorate those consequences. As long as he acts promptly, a dealer may inquire of customers whether, because of the heavy demand for the stock and its likely impact on the market price, customers wish to modify their orders.

■ The district court's finding that Lehman breached its obligation to plaintiffs is established by the evidence. Stoyeck contacted them on October 17 when he was in the process of building a large demand for RPM stock. He continued to enlarge this demand until it reached the point where the orders to buy were of such magnitude that they could not be filled immediately without unduly driving up the price. Lehman's chief of over the counter trading testified that if plaintiffs' orders had been filled on the day received, the price would have gone to $14.40 or even $14.90.[2] Lehman acted reasonably in delaying its purchases in order to lighten the effect upon the market. The important fact is that the volume of purchase orders meant a substantial change in the condition of the market, a condition that would necessarily drive up the price of RPM stock. Plaintiffs were entitled to be told about this development so that they could elect to buy no RPM stock or to go elsewhere to place their orders.

There is no merit at all to the points of error urged in this appeal. Lehman argues that the trial court's finding that Stoyeck failed to make full disclosure is clearly erroneous, despite the certain testimony of all plaintiffs and Stoyeck's equivocation. It then suggests that Stoyeck must have been acting outside of his scope of authority, because Lehman's policies required him to make the disclosure. But Lehman does not deny that Stoyeck had full authority to conduct the transaction with the plaintiffs and to see that it was consummated precisely at the price paid by plaintiffs. Then Lehman argues that by concluding the

transaction and buying the stock, plaintiffs waived their claim or suffered an estoppel. Plaintiffs objected to the higher price but they had no knowledge of the circumstances of Lehman's dereliction. There was no intentional relinquishment of any right by plaintiffs, and there was no change of position to its detriment on the part of Lehman. Finally, Lehman says that plaintiffs should have mitigated their damages, apparently forgetting that the plaintiffs are not suing for the loss they suffered in the declining market but only for the added cost to them of their stock caused by the breach on the part of Lehman. On the other hand, plaintiffs have urged by cross-appeal that they are entitled to exemplary damages. The difficulty with their contention is that they sought no exemplary damages in the district court, and they failed to present evidence of Lehman's malice, fraud, or conscious indifference.

Lehman makes no complaint about the court's finding that plaintiffs "could have purchased the stock ... on October 17 and October 20, 1980" for $13.375 per share. The computation of damages is not questioned.

The judgment is AFFIRMED.

---

2. Allowing the commission on top of that, the cost to the plaintiffs would have been less than the $15.75 they were ultimately charged.