Carolyn Maxey HAND, Appellant,

v.

DEAN WITTER REYNOLDS INC. and W. Michael Robertson, Appellees.

No. A14–93–01024–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

Oct. 6, 1994.

Rehearing Overruled Nov. 17, 1994.

Joseph R. Joy, III, Lafayette, LA, Larry Trimble, Houston, for appellant.

J. Steven Stewart, Houston, Rodney Acker, Dallas, W. James Kronzer, Leslie C. Taylor, Houston, for appellees.

Before MURPHY, ELLIS and BARRON, JJ.

## OPINION

MURPHY, Justice.

Carolyn Maxey Hand (Hand), appellant, sued Dean Witter Reynolds Inc. (Dean Witter) and W. Michael Robertson (Robertson), appellees, for negligence and violations of the Texas Deceptive Trade Practices–Consumer Protection Act (DTPA) for failing to purchase oil option contracts as allegedly requested by Hand through her father, Bryan Maxey (Maxey). The trial court granted summary judgment in favor of Dean Witter and Robertson. We affirm.

Dean Witter is a securities brokerage firm with offices in Houston. Robertson is a licensed stock broker employed by Dean Witter in Houston since 1981. Hand's father, Bryan Maxey, gave Hand securities in the late 1950s. The securities were originally placed in an account set up with Merrill Lynch in Dallas, where appellant resides. Because Maxey traditionally made most of the decisions regarding investments or

trades, Hand decided to move the account to Dean Witter's office in Houston so Maxey could more conveniently access the account and make trades. Of course, all trades had to be authorized by Hand because the account belonged to her. The account was supervised by Robertson.

On or about June 20, 1990, Maxey called Hand and his other daughter, Mary Maxey. Hand alleged that her father called them because he had learned that oil was at an eighteen month low and OPEC was going to meet soon with the intention of driving prices higher. Hand alleged that Maxey apprised them of his findings and advised them to authorize $30,000.00 from each of their accounts to purchase uncovered oil commodity option contracts. A commodity option contract[1] vests a person with the right, for a specified period of time, to either buy or sell the subject of the option at a predetermined price. 1 PHILIP MCBRIDE JOHNSON & THOMAS LEE HAZEN, COMMODITIES REGULATION § 1.07, 22–23 (1989). Hand and her sister gave Maxey authorization to make the purchase.

Maxey called Robertson and inquired about placing an order for Hand to buy oil options. At this point, the parties' rendition of events differs dramatically. Maxey allegedly told Robertson that timing was critical and that he wanted the purchase completed before any price increase adversely affected profits. Hand alleged that Robertson advised Maxey that it would take seven to ten days to complete the transaction. He further advised Maxey that the paperwork necessary to complete the transaction would

have to be sent from Chicago. Hand claims both of these representations were false.

According to Hand, Robertson did not send the necessary papers to her until ten days after the original request. She also alleges that the paperwork did not have to be sent from Chicago, but was in fact sent from Dean Witter's Houston office. By the time it reached her, oil prices had already increased.

Appellees' rendition of the facts disagrees with that given by appellant. First, appellees contend that neither Hand nor Maxey ever sought or received any investment advice from Robertson. Next, appellees claim that when Maxey phoned Robertson inquiring about the options, Robertson told Maxey: (1) he did not trade option contracts; (2) Hand's account was not approved for such trades, i.e., she did not have a commodities account with Dean Witter; (3) Hand would have to fill out the application papers required by federal law and qualify to do the requested trades; and (4) it would take a week to ten days to open and approve an account that would allow such trades. During the same conversation, Robertson also allegedly informed Maxey that he would not make the requested trade, but he would send the forms to Hand and Maxey. Appellees allege that after Maxey received this information, he knew that a trade or option purchase could not be completed that day because the requisite forms had to be returned and the new account approved. Appellees sent the forms to Hand but she never returned them. Appellees claim that Hand did not return the forms because she was told by Maxey that the trade would be too late if not

---

1. Appellant confuses the terms commodities futures and commodity option contracts. A commodities futures contract is "an agreement between a seller and a buyer that the seller (called a *short*) will deliver to the buyer (called a *long*), at a price agreed to when the contract is first entered, and that the buyer will accept and pay for, a specified quantity and grade of an identified commodity during a defined period in the future." 1 PHILIP MCBRIDE JOHNSON & THOMAS LEE HAZEN, COMMODITIES REGULATION § 1.03, 10–11 (1989). (emphasis in the original) In other words, a futures contract is an agreement obligating an investor to purchase certain commodities at a future date for a fixed price. *Morgan v. State*, 644 S.W.2d 766, 770 (Tex.App.—Dallas 1982, no writ); *see Clayton Brokerage Co. of St. Louis, Inc. v. Mouer*, 520 S.W.2d 802, 804 (Tex.

Civ.App.—Austin 1975), *writ dism'd w.o.j.*, 531 S.W.2d 805 (Tex.1975). A commodity option contract, on the other hand, simply vests a person with a *right*, for a specified period of time, to buy or sell the commodity at a predetermined price. *See International Trading, Ltd. v. Bell*, 262 Ark. 244, 249, 556 S.W.2d 420, 422 (1977), *cert. denied*, 436 U.S. 956, 98 S.Ct. 3068, 57 L.Ed.2d 1120 (1978); COMMODITIES REGULATION at § 1.07, 22–23. (emphasis in the original) The most distinguishing feature between a commodity option contract and a futures contract is the option holder's right to simply let the option lapse if it turns out to be unprofitable. *Id.* at § 1.07, 24. In a futures contract, the party is responsible for the total change in value of the contract while he or she owned it. *Id.*

accomplished on the same day that Maxey had talked with Robertson. Neither Hand nor Maxey ever tried to get another broker to complete the transaction.

Hand claims that the trade could not have been completed in any event because the transaction requested by her father was absolutely prohibited. She claims that the existing office policy was that the few brokers that were allowed to do this type of transaction on a limited basis were not allowed to open any new accounts at the time of her request. Hand alleges that Robertson knew of the office policy and that he failed to advise Hand or her father that the purchase was an impossibility and that they should seek the services of another brokerage firm if they wished to complete the transaction in a timely manner.

Hand never made any purchases of oil options and ultimately brought suit against the appellees. In her Original Petition, Hand claimed that Robertson, an employee of Dean Witter, acting in the course and scope of his employment, failed to purchase oil options as requested and directed and that as a result, she lost $4,125,000.00, the profit she would have realized had the purchase been made when requested. Hand alleged that this failure to act constituted negligence that proximately caused her damages. She further alleged that she was a consumer under the DTPA and that appellees conduct was false, misleading, or deceptive and thus, prohibited by the DTPA. Hand also requested attorney's fees and pre- and post-judgment interest.

Appellees filed a motion for summary judgment claiming they were entitled to judgment as a matter of law on Hand's negligence claim because:

(1) neither Dean Witter nor Robertson owed Hand a legal duty; and

(2) Hand's refusal to execute and return the necessary paperwork was the sole proximate cause of her alleged damages.

They also claimed they were entitled to summary judgment as to Hand's DTPA claim because:

(1) federal law preempts state law on any cause of action connected with the sale of commodities option contracts; and

(2) the sale of commodities option contracts is not a sale of goods or services under the DTPA.

Alternatively, they argued that even if Hand's claims are valid, her damages must be measured by the difference between the price of an oil option contract on June 19, 1990, and the highest value such contract may have obtained between June 19, 1990, and a reasonable time thereafter in which to allow her to purchase another option contract through another broker. They alleged that she is not entitled to the difference between the June 19th price and the highest price of the option contract before its expiration.

On July 20, 1993, the trial court signed an order granting summary judgment in favor of appellees. The court did not specify the reasons for its ruling in the order. Appellant appeals from that judgment. She brings five points of error contending that the trial court erred in granting summary judgment on each and every ground raised by appellees in their motion.

A summary judgment is not entitled to the same deference given to a judgment following a trial on the merits of the case. *See Montgomery v. Kennedy*, 669 S.W.2d 309, 310–11 (Tex.1984). When it reviews a trial court's order granting summary judgment, the appellate court does not view the proof in the light most favorable to the judgment; rather, it must indulge every reasonable inference in favor of the non-movant. *E.g., Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 548–49 (Tex.1985). The issue on appeal is whether the movant has proved it is entitled to judgment as a matter of law, not whether the non-movant raised a material fact issue precluding the summary judgment. *E.g., Gibbs v. General Motors Corp.*, 450 S.W.2d 827, 828–29 (Tex.1970); *see* Tex.R.Civ.P. 166a(c). If the movant fails to meet its burden, the appellate court must reverse and remand the action for further proceedings. *Gibbs*, 450 S.W.2d at 828–29.

The Texas Supreme Court has clearly instructed appellate courts on the appropriate standards to be used when reviewing summary judgments:

1. The movant has the burden of showing there is no genuine issue of material fact and that it is therefore entitled to judgment as a matter of law.

2. In determining whether there is a material issue of fact precluding summary judgment, evidence favorable to the non-movant must be taken as true.

3. Every reasonable inference must be indulged in favor of the non-movant and any doubt resolved in its favor.

*Nixon,* 690 S.W.2d at 548–49; *Montgomery,* 669 S.W.2d at 310–11.

■ Because the trial court's order does not state the grounds on which the court sustained appellees' motion, the summary judgment will be affirmed if any of the theories advanced are meritorious. *Carr v. Brasher,* 776 S.W.2d 567, 569 (Tex.1989); *see Maley v. 7111 Southwest Freeway, Inc.,* 843 S.W.2d 229, 234 (Tex.App.—Houston [14th Dist.] 1992, writ denied). In her first point of error, Hand contends that the trial court erred in granting summary judgment in favor of appellees as to her negligence claim based on appellees' argument that they did not owe her a legal duty.

■ We must first discuss a procedural difficulty with some of the arguments contained in Hand's appellate brief under point of error number one. In her brief, she raises a new negligence theory concerning appellees' duty, or lack thereof, as it relates to her negligence claim. This theory was not pled in her original petition, but only raised in

appellant's brief filed in response to appellees' motion for summary judgment. She argues that Robertson negligently advised her about the mechanics of opening an account for option trading, that he misrepresented the likelihood that Dean Witter would accept such an account, and that he incorrectly advised her about the time involved in opening the account. She claims that the information allegedly given by Robertson was false. This is a claim for negligent misrepresentation and was not properly pled by appellant.[2] Appellant did not plead any facts that would have put the appellees on notice that she was making a claim based on alleged representations by Robertson. The only conduct complained of by appellant in her original petition was the alleged failure of appellees "to purchase the options or take necessary steps to purchase the options." There are no allegations in her original petition under her negligence claim that appellees made false representations.[3]

■ A petition is sufficient if it gives fair notice of the facts upon which the pleader bases his or her claims so that the opposing party may adequately prepare a defense. *Transmission Exchange, Inc. v. Long,* 821 S.W.2d 265 (Tex.App.—Houston [1st Dist.] 1991, writ denied). The test is whether an opposing attorney of reasonable competence, with the pleadings before him, can ascertain the basic issues in controversy. *State Fidelity Mortgage Co. v. Varner,* 740 S.W.2d 477, 479 (Tex.App.—Houston [1st Dist.] 1987, writ denied). Here, while appellees' attorney could ascertain from the original petition that appellant was alleging claims for negligence based on appellees' failure to purchase the options and violations of the DTPA, it could

---

**2.** Actionable misrepresentation requires proof of the following: (1) that a material representation was made; (2) that the representation was false; (3) that when the speaker made the representation he knew it was false; (4) that the speaker made the representation with the intention that it be relied upon; (5) that the party relied on the representation; and (6) that the relying party suffered injury. *Stone v. Lawyers Title Ins. Corp.,* 554 S.W.2d 183, 185 (Tex.1977).

**3.** She also argues on appeal that there was a fiduciary relationship between herself and Robertson, or that there is at least a fact issue as to whether such a relationship existed. Because of

that relationship, she claims that she was entitled to rely on Robertson to act in her best interests and give her good advice. While breach of a fiduciary duty is a type of wrong for which the court of Texas will afford a remedy, there are no allegations in appellant's original petition that a fiduciary or special relationship existed between the parties. *See Duncan v. Lichtenberger,* 671 S.W.2d 948, 953 (Tex.App.—Fort Worth 1984, writ ref'd n.r.e.). Though we will discuss the issue as it relates to the concept of duty, we wish to note that appellant did not plead any facts to support this cause of action.

not be ascertained that appellant was claiming appellees made false representations. We are aware that a petition is to be construed liberally in favor of the pleader when there are no special exceptions. *See Roark v. Allen,* 633 S.W.2d 804, 809 (Tex.1982). That rule does not help appellant in this case because her petition contained no fair indication that common-law misrepresentation was being alleged. *See Ross v. Texas One Partnership,* 796 S.W.2d 206, 212 (Tex.App.— Dallas 1990), *writ denied per curiam,* 806 S.W.2d 222 (Tex.1991) (court of appeals holding that petition contained allegations of negligence and gross negligence but no allegations of intentional conduct). It is not a defendant's responsibility to urge special exceptions to "flesh out" allegations that are not even hinted at in a petition.

> We are aware of no authority indicating that a defendant must specially except because a plaintiff has wholly failed to plead an alternative cause of action. Our judicial system rests upon the foundation of adversary presentation, *Fikes v. Ports,* 373 S.W.2d 806, 808 (Tex.Civ.App.—Fort Worth 1963, writ ref'd n.r.e.), and one party is under no obligation to help his adversary plead an unpleaded cause of action.

*Id.*

■■■ In her motion for new trial appellant claimed that she filed an amended original petition on July 19, 1993, and that this petition included the new allegations. First, we do not know if appellant actually filed the amended petition because it is not in the record before us. It is appellant's burden to see that a sufficient record is presented to show error requiring reversal. Tex.R.App.P. 50(d). Because the amended petition is not in the record, we cannot consider it or appellant's arguments concerning its contents. Also, appellant has raised no point of error and no argument suggesting that it should have been considered by the trial court. Without proper assignment of error and argument, we cannot reverse a judgment. *San Jacinto River Auth. v. Duke,* 783 S.W.2d 209, 210 (Tex.1990); Tex.R.App.P. 52(a).

■■■ Further, even if the amended petition was in the record and appellant had raised a point of error concerning it, this amended petition was allegedly filed just one day before the trial court signed its order granting summary judgment in favor of appellees. Rule 63 of the Texas Rules of Civil Procedure states:

> Parties may amend their pleadings ... provided, that any amendment offered for filing within seven days of the trial ... shall be filed only after leave of the judge is obtained, which leave shall be granted by the judge unless there is a showing that such amendments will operate as a surprise to the opposite party.

Tex.R.Civ.P. 63.

A summary judgment proceeding is a trial within the meaning of rule 63. *Goswami v. Metropolitan Sav. and Loan Ass'n,* 751 S.W.2d 487, 490 (Tex.1988). The record does not reflect whether leave of court was requested or granted or whether it was requested and denied. The trial court's judgment does not state that it considered all of the pleadings on file. *See id.* Lastly, the document does not appear in the appellate record. Therefore, we conclude that appellant's claim for negligent misrepresentation and her claim that a fiduciary relationship existed were not properly before the trial court because if the amended petition was filed, it was not timely filed. *See id.* at 490–91. In light of this, we will not consider the new negligence allegations or the arguments relating to them. We will only consider the negligence claim contained in appellant's original petition, i.e., that appellees' alleged failure "to purchase the options or take necessary steps to purchase the options constitutes negligence" proximately caused appellant to lose approximately four and a half million dollars. Thus, the question is whether appellees had a duty "to purchase the options or take necessary steps to purchase the options" because this was the only act of negligence alleged by appellant in her petition.[4]

---

**4.** In her brief, appellant argues that by virtue of her negligence and DTPA allegations she also stated claims for breach of fiduciary duty, common-law negligent misrepresentation, and gross negligence. We disagree. These causes of action are independent and if appellant wished to

■ The elements of negligence include (1) a duty owed by one person to another, (2) a breach of that duty, and (3) damages proximately resulting from the breach. *Smith v. Sewell,* 858 S.W.2d 350, 355–56 (Tex.1993); *Barnes v. Wendy's Int'l, Inc.,* 857 S.W.2d 728, 729 (Tex.App.—Houston [14th Dist.] 1993, no writ). The threshold inquiry in a negligence case is duty, and that is a question of law for the court to decide from the facts surrounding the occurrence in question. *Greater Houston Transp. Co. v. Phillips,* 801 S.W.2d 523, 525 (Tex. 1990); *Salinas v. General Motors Corp.,* 857 S.W.2d 944, 947 (Tex.App.—Houston [1st Dist.] 1993, no writ). A defendant must have a recognized legal duty or obligation to the plaintiff or he/she cannot be liable for negligence. *Way v. Boy Scouts of Am.,* 856 S.W.2d 230, 233 (Tex.App.—Dallas 1993, writ denied); *Barnes,* 857 S.W.2d at 729. A duty, in the context of a negligence claim, is a legally enforceable obligation to comply with a certain standard of conduct. *Way,* 856 S.W.2d at 233 (citing W. Page Keeton et al., PROSSER AND KEETON ON THE LAW OF TORTS § 53 at 356 (5th ed. 1984).

■ To determine whether a duty exists, courts apply a risk-utility balancing test. *Way,* 856 S.W.2d at 234. The court must consider the risk, foreseeability, and the likelihood of injury weighed against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing that burden on the actor. *Bird v. W.C.W.,* 868 S.W.2d 767, 769 (Tex.1994); *Greater Houston Transp. Co.,* 801 S.W.2d at 525; *Otis Eng'g Corp. v. Clark,* 668 S.W.2d 307, 309 (Tex. 1983). Of these five factors, foreseeability is the foremost and dominant concern. *Greater Houston Transp. Co.,* 801 S.W.2d at 525; *Way,* 856 S.W.2d at 234. The test for foreseeability is "what one should under the circumstances reasonably anticipate as consequences of his conduct." *Way,* 856 S.W.2d at 234 (citing *McCullough v. Amstar Corp.,* 833 S.W.2d 312, 315 (Tex.App.—Amarillo 1992, no writ) (quoting *City of Dallas v. Maxwell,*

248 S.W. 667, 670 (Tex.Comm'n App.1923, holding approved)).

■ For appellees, as movants, to prevail on their motion for summary judgment, they must either disprove at least one element of Hand's theory of recovery, or plead and conclusively establish each and every element of an affirmative defense, thereby rebutting Hand's cause of action. *See International Union UAW Local 119 v. Johnson Controls, Inc.,* 813 S.W.2d 558, 563 (Tex.App.—Dallas 1991, writ denied). A matter is conclusively established if ordinary minds cannot differ as to the conclusion to be drawn from the evidence. *Triton Oil & Gas Corp. v. Marine Contractors & Supply, Inc.,* 644 S.W.2d 443, 446 (Tex.1982). Appellees claimed in their motion for summary judgment that their summary judgment proof negated, as a matter of law, the element of duty. They contend they had no duty to purchase the options or take the necessary steps to purchase the options, the conduct alleged by Hand to constitute negligence. Hand claims that appellees' summary judgment proof consists of mere conclusions or inferences that are insufficient to prove that appellees did not owe Hand a legal duty and therefore, the trial court erred in granting summary judgment for appellees on this basis. She argues that there is "absolutely no summary judgment evidence or law to support a lack of a duty on behalf of Appellees."

First, we must mention that appellant contends in her argument that Robertson allegedly told Maxey that it would take ten days to two weeks to complete the necessary paperwork so that the trade could be made. Appellant provided summary judgment proof that the trade could actually be accomplished in hours. She also claims that appellees would not have done the trade in any event because of office policy and this fact was not communicated to her or her father. She claims that Robertson held himself out as an expert in the commodities field, and that she relied on his advice to her detriment. She also points to the deposition testimony of Scott Curren, the office manager for the

allege these claims she should have included them in her original petition. A liberal reading of her petition shows that she only pled that

appellees acted negligently in failing to purchase or take steps to purchase the options and violated the DTPA.

Dean Witter office where appellant had her account. He stated that Robertson could not, in any event, open a new futures account for appellant and that only one broker in the office could. Curren also stated that Robertson could either refer appellant to that broker, another brokerage house, or simply tell them he could not make the trade. He also stated that a broker should give a customer as much information as possible. Taking all of this as true and indulging all reasonable inferences therefrom in favor of appellant, it makes no difference to our determination of the existence of duty in this case. As we stated earlier, appellant did not plead misrepresentation or a breach of fiduciary duty; she only pled that appellees' failure to make the purchase or take steps to do so was negligent. Thus, the only question is whether appellees had a duty, i.e., a legal obligation, to make the requested purchase.

 Whether appellees had a duty to purchase the options or to take steps toward that end is a question of law. *See Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex.1990). In order to make that determination, we must look at the facts surrounding the request. *Id.* Robertson swore in his affidavit that appellant's account was a non-discretionary account. This type of account is one in which the customer must approve all transactions before they are effected. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cheng*, 901 F.2d 1124, 1128 (D.C.Cir.1990); *Hotmar v. Lowell H. Listrom & Co.*, 808 F.2d 1384, 1385 (10th Cir. 1987); *Bache Halsey Stuart Shields, Inc. v. Erdos*, 35 Wash.App. 225, 227, 667 P.2d 89, 90 (1983); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Boeck*, 127 Wis.2d 127, 377 N.W.2d 605, 608 (1985); 55 Eliot J. Katz,

Annotation, *Commodities Broker's State-Law Duties to Customers*, 55 A.L.R. 4th 394, 428 n. 66 (1987). A discretionary account is one where the broker makes the investment decisions and manages the account. *Id.* Robertson's description of the account was backed up by the deposition testimony of appellant's father, Maxey. Maxey stated that he never took investment advice or counseling from anyone. Specifically, he testified that when he called Robertson to discuss the oil options, he would not have taken any advice from Robertson "regardless." Maxey stated that he made all the trading decisions. Robertson also stated in his affidavit that appellant's account allowed the purchase of stocks and covered options, but not commodities or uncovered options. The oil option contracts that appellant desired to purchase were uncovered option contracts to buy a commodity, i.e., oil. Thus, in order to make the requested purchase, appellant would have to open a new type of account in order to enter the commodities market. Robertson's statements about the nature of appellant's Dean Witter account and the necessity of opening a new account in order to make the oil options purchase are part of appellees' summary judgment proof and were uncontroverted. Further, appellant's counsel admitted during oral argument before this court that appellant's account was not set up to trade in uncovered oil options. In her deposition, Hand admitted that she did not know the nature of her account. She did not contradict Robertson's description of the account or Maxey's testimony regarding trading decisions.

 The relationship between a broker and its customer is that of principal and agent.[5] *Magnum Corp. v. Lehman Brothers*

---

5. The relationship between an agent and a principal is a fiduciary one. *Hill v. Bache Halsey Stuart Shields Inc.*, 790 F.2d 817, 824 (10th Cir. 1986) (quoting *Restatement (Second) of Agency* § 13 (1958)). But because the relationship is a consensual one, no fiduciary duties arise until the agency relationship begins, i.e. when the broker accepts the customer's order and agrees to execute it. *Robinson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 337 F.Supp. 107, 111 (N.D.Ala.1971), *aff'd*, 453 F.2d 417 (5th Cir. 1972). Further, agents are only fiduciaries "with respect to matters within the scope of [their] agency." *Hill*, 790 F.2d at 824. In a non-

discretionary account, a broker's duty is confined to executing the orders he or she has accepted from the customer. *Id.* Thus, the fiduciary duty owed to the customer is very narrow—primarily not to make unauthorized trades. *Id.* (citing *Limbaugh v. Merrill Lynch, Pierce, Fenner & Smith*, 732 F.2d 859, 862 (11th Cir.1984); *Shearson Hayden Stone, Inc. v. Leach*, 583 F.2d 367, 371–72 (7th Cir.1978); *Fey v. Walston & Co., Inc.*, 493 F.2d 1036, 1049 (7th Cir.1974)). Appellant did not plead that appellees owed her a fiduciary duty or that they breached any such duty; however, even if she had, appellees would

*Kuhn Loeb, Inc.,* 794 F.2d 198, 200 (5th Cir.1986). An agent is one who consents to act on behalf of, and subject to, the control of another, the principal, who has manifested consent that the agent shall so act. *Moody v. EMC Services, Inc.,* 828 S.W.2d 237, 241 (Tex.App.—Houston [14th Dist.] 1992, writ denied); *Republic Bankers Life Ins. Co. v. Wood,* 792 S.W.2d 768, 778 (Tex.App.—Fort Worth 1990, writ denied); RESTATEMENT (SECOND) OF AGENCY § 1 (1958). Agency is a consensual relationship, and the agency or broker/customer relationship does not come into existence until the order has been placed and the broker has consented to execute it. *Hill v. Bache Halsey Stuart Shields Inc.,* 790 F.2d 817, 824 (10th Cir.1986); *Robinson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 337 F.Supp. 107, 111 (N.D.Ala.1971), *aff'd,* 453 F.2d 417 (5th Cir.1972); RESTATEMENT (SECOND) OF AGENCY § 15 (1958). If a party refuses to act as an agent for the "principal," no relationship between the parties arises and the "agent" has no duty to act for the "principal." *See Hill,* 790 F.2d at 824; *Robinson,* 337 F.Supp. at 111.

The undisputed summary judgment proof shows that Robertson refused to place the order requested by Maxey for his daughter.[6] Maxey stated in his deposition that when he called Robertson to purchase the oil options, Robertson refused to do it. The Maxey's deposition testimony reads as follows:

Q What was the purpose of that particular phone call [to Robertson]?

A The purpose of the phone call was to buy oil options that day, $30,000 apiece, for my two daughters.

Q Is that what you told Mr. Robertson?

A Absolutely.

Q **And did he refuse to do so?**

A **He did.**

(emphasis added)

At another place in his testimony, Maxey again admits that Robertson refused to accept the order:

Q Mr. Maxey, so, tell us what happened when you called Mr. Robertson?

A Well, I talked to Mr. Robertson and I told him what I wanted to do, that I wanted to purchase $30,000 worth of oil options for each of my daughters. And he says, **"You can't do it."**

(emphasis added)

Although it is undisputed that Robertson refused to place the order, why Robertson did so is in dispute. Robertson's reasons for refusing to execute the purchase, even if false, are irrelevant, given the lack of pleading of fraud or misrepresentation. Thus, the only question is whether appellees had to accept the order for the option contracts. We think not.

 As we previously stated, agency is a consensual relationship on both sides, i.e., both the principal **and the agent** must agree that the agent will act on behalf of the principal. *See id.* (emphasis added). The agency relationship between a broker and a customer does not come into existence until the order has been placed and the broker has consented to execute it. *Id.* In a non-discretionary account, the agency relationship begins when the customer places the order and ends when the broker executes it because the broker's duties in this type of account, unlike those of an investment advisor or those of a manager of a discretionary account, are "only to fulfill the mechanical, ministerial requirements of the purchase or sale of the security or future[s] contracts on the market." *Robinson,* 337 F.Supp. at 111 (quoting *Walston & Co. v. Miller,* 100 Ariz. 48, 410 P.2d 658, 661 (1966)). As a general proposition, a broker's duty in relation to a nondiscretionary account is complete, and his authority ceases, when the sale or purchase is made and the receipts therefrom account-

not be liable. First, Robertson never consented to accept the order so the agency relationship did not arise and there was no fiduciary responsibility. Second, even if it could be said that Robertson consented to the agency relationship, i.e., he agreed to execute the order given by Maxey, he did not breach any fiduciary duty because he did not make any unauthorized trades.

6. The appellees dispute the fact that Maxey even placed an order for the options because he was not specific enough, e.g. he did not set a time for the expiration of the options. For the purposes of this appeal, we accept appellant's position that Maxey did attempt to place an order.

ed for. *Robinson,* 337 F.Supp. at 111; *see Leib v. Merrill Lynch, Pierce, Fenner & Smith,* 461 F.Supp. 951, 953 (E.D.Mich.1978). Thus, each new order is a new request that the proposed agent consents to act for the principal. *See id.* There is no on-going agency relationship as there would be with a financial advisor or manager of a discretionary account. Thus, each time Maxey placed an order for appellant, Robertson had to decide whether to accept the agency, i.e., accept the order, before any relationship, and any duties from that relationship, arose. Because Robertson refused to accept the order to purchase the options, for whatever reason, no relationship arose between the parties and neither Robertson nor Dean Witter had any duty to appellant.

 A broker does not have a duty to the public at large to buy or sell securities, futures contracts, or commodity option contracts. *See Berlage v. Jack White & Co., Inc.,* Comm.Fut.L.Rep. (CCH) para. 24,323, at 35,407 (CFTC Sept. 8, 1988). Nor does a broker have to take all comers as customers. *Id.* In other words, a broker does not have to open new accounts for people simply because they call up and request that he do so. As was stated in *Berlage:*

> Brokers, despite the regulations to which they are subject are not public utilities with the legal obligation to serve all comers on an equal basis. They are permitted to exercise business judgment in the acceptance of clients and clients' orders.

*Id.*

 Generally, while a broker has a duty to execute a customer's order to liquidate existing positions, he has no duty to accept an order to open new positions unless he accepts the agency. *See Courtland v. Walston & Co., Inc.,* 340 F.Supp. 1076, 1079 (S.D.N.Y.1972); *Busch v. Rothschild & Co.,* 23 A.D.2d 189, 259 N.Y.S.2d 239, 240 (N.Y.App.Div.1965); *Capital Options Investments, Inc. v. Goldberg Brothers Commodities, Inc.,* Comm.Fut.L.Rep. (CCH) para. 24,-951, at 37,482 (D.C.Ill.1990) [hereinafter *Capital Options* ]. The only duty that arises, if a broker refuses to accept the agency, is that the broker must give prompt notice that the order is refused. *Id.; see also Gallagher v.*

*Jones,* 129 U.S. 193, 196–201, 9 S.Ct. 335, 336–37, 32 L.Ed. 658 (1889).

In *Capital Options,* Capital, a registered introducing broker which brokered commodity options investments to the retail public, entered into a clearing agreement with Goldberg, a registered futures commission merchant, and a letter agreement with Linnco, another introducing broker, regarding the execution and clearing of Capital's commodity futures and options business. *Capital Options* at 37,478. Capital solicited customer accounts and dealt directly with the customers. *Id.* Capital gave investment advice and took customers' orders. *Id.* Goldberg and Linnco worked together as the clearing broker for Capital. *Id.* They received the orders from Capital, arranged for the execution, processed the trades, issued account statements, and held customer funds in separate accounts. *Id.* Every Capital customer that had an account cleared through Goldberg and Linnco signed a customer agreement with Goldberg. *Id.*

Capital's customers traded on the margin; that is, the customer posted, in advance, funds equal to only a fraction of the potential loss. *Id.* Under the customer agreements, Goldberg and Linnco, as clearing brokers, had the right to request whatever margin they desired and the right to close a customer's position if the customer refused to post the requested margin. *Id.* Capital was required to communicate any margin requests to the customer and use its best efforts to assure payment. *Id.*

On October 19, 1987, the stock market suffered its greatest one day drop in history (the October crash). On November 4, 1987, most of Capital's customers were holding combinations of naked gold options positions as part of a trading strategy known as a strangle. *Id.* The positions had been opened prior to the October crash and were not due to expire until late in 1987 and early in 1988. *Id.* at 37,478–479. The risks associated with this positions were substantial, and so Linnco decided, on November 5, 1987, that it no longer wished to bear the risks of the positions without additional margin. *Id.* at 37,479. Thus, Linnco increased the margin

requirements on these positions to $15,000.00 and gave Capital's customers one hour to satisfy the increase. *Id.* None of the customers satisfied the requirements and the options were closed out on that date. *Id.*

On November 17, 1987, Goldberg and Linnco voluntarily terminated their relationship, and Linnco established a similar relationship with another clearing broker. *Id.* Capital requested that Linnco arrange for the transfer of its customers' account to the new clearing broker and Linnco complied. *Id.* Two days after the transfer, Capital attempted to established new naked short options positions for its customers. Linnco informed Capital that it would not accept the orders, but would accept orders to close out existing positions. *Id.* Later that month, Capital transferred its customers' accounts to yet another clearing broker. *Id.*

Capital brought suit against Goldberg and Linnco alleging, among other things, that they wrongfully refused to accept orders from Capital for new positions. *Id.* Goldberg and Linnco moved for summary judgment and the motions was granted. *Id.* at 37,477. In making its decision, the district court held:

> A broker generally has a duty to accept customer orders to liquidate existing positions, but has no duty to accept customer orders for new positions. *French v. Bache Halsey Stuart, Inc.,* Comm.Fut.L.Rep. [para.] 20,444 (CFTC 1977). . . . As stated in *French:* 'The rationale of the law on this point seems evident; the execution of new contracts exposes the broker, as well as the customer, to new financial risks. One party should not be able to impose risks on the other without the other's consent.' *Id.* (p. 21,806).

*Id.* at 37,482.

We adopt this reasoning. First, appellant had a non-discretionary account with appellees that could not be used to trade uncovered oil options. The agency relationship on this account between appellant and Robertson could only begin when he accepted an order and could only end when he executed it. There was no ongoing agency relationship between the parties. Robertson did not give appellant or her father financial advice

such that a continuing agency relationship was created. Appellant attempted to place an order, through her father, that could not be purchased on the terms of her existing account. Robertson never accepted the order to open a new position for appellant, thus, they had no agency relationship and no duties arose. Second, Robertson and Dean Witter had no duty to open or to take the steps necessary to open a new account for appellants. *See id.* Thus, the only duty appellees had to appellant was the duty to promptly inform her that they were not accepting her order. It is undisputed that she, through her father, was so informed.

Further, the holding that a broker has no duty to take all comers or specifically, no duty to open new positions for customers, is valid under the Texas risk-utility balancing test. *See Way,* 856 S.W.2d at 234. We acknowledge that the harm to a potential customer who is unable to open a new position is foreseeable and that the customer could lose out on the chance to make a great deal of money; however, foreseeability alone is not a sufficient basis for creating a new duty. *See Boyles v. Kerr,* 855 S.W.2d 593, 599 (Tex.1993). A customer's right to sue a broker for refusing to open a new position in the market must be considered in light of countervailing concerns, particularly the consequences of placing that requirement on a broker. To impose this duty on broker or brokerage houses would be to require them to act as a public utility and would deny them the right to exercise business judgment in the acceptance of customers and customers' orders. There are no Texas cases imposing such a duty, and the authorities in other jurisdictions have refused to impose it. Lastly, an analysis under the risk-utility balancing test supports our decision not to impose this duty on brokers.

In support of her position that appellees owed her a duty, appellant cites *Nattrass v. Rosenthal and Co.,* 641 S.W.2d 675 (Tex. App.—Fort Worth 1982, writ ref'd n.r.e.). This case does not support appellant's claim that she was owed a duty by appellees. In *Nattrass,* the plaintiffs purchased Brazilian coffee options through the London Commodity Exchange. *Id.* at 677. The options were

purchased in October of 1977. *Id.* Rosenthal and Company, a Chicago-based brokerage house with an office in Ft. Worth, procured the options for the plaintiffs through their agent, Larkin. *Id.* All of the plaintiffs were account holders with Rosenthal and Company. *Id.* The accounts were obviously suitable for trading commodity options. *See id.*

The plaintiffs were advised that they would be required to hold on to their options for six months in order to receive favorable tax treatment for long-term capital gains. *Id.* The plaintiffs arranged a meeting with Larkin and instructed him that April 23, 1977, was the first day after six months at which the desired tax treatment could be obtained. *Id.* They advised him that he should get them out of the market as soon as possible after that date because of the rapidly decreasing prices for September, 1977 coffee. *Id.* at 678. Larkin did not follow the plaintiffs' instructions until May 4, 1977. *Id.* Plaintiffs felt that the delay caused them to lose money and sued Rosenthal and Company and Larkin for the amount they would have realized had Larkin "taken them out of the market" at the time he was instructed. *Id.*

The case went to the jury and it found that Larkin failed to follow the plaintiffs' instructions. *Id.* The jury awarded plaintiffs $35,745.00 in damages. *Id.* Both the plaintiffs and the defendants appealed. *Id.* at 677. On appeal, Rosenthal and Company and Larkin complained about the trial court's jurisdiction and evidentiary matters. The plaintiffs complained about the amount of damages and prejudgment interest awarded to them. There was no complaint concerning duty and the court did not discuss such an issue.

*Nattrass* is inapplicable to appellant's claim regarding duty for several reasons. First, the case did not even discuss the issue of duty. Second, the customers in *Nattrass* had an existing account on which they could trade commodity options; they were not asking the broker to open new positions for them. Third, and most importantly, the customers in *Nattrass* were directing the broker to liquidate existing accounts. As we stated earlier, a broker generally has a duty to accept customer orders to liquidate existing positions. *Capital Options* (citing *French v. Bache Halsey Stuart, Inc.*, Comm.Fut.L.Rep. para. 20,444 (CFTC 1977)). However, the broker has no duty to accept customer orders for new positions. *Id.* The situations are totally inapposite.

Because appellees had no duty to make the purchase appellant requested, the trial court correctly granted appellees' motion for summary judgment on the negligence claim. Appellant's first point of error is overruled.

In her fourth point of error, appellant contends the trial court erred in granting appellees' motion for summary judgment and holding that her cause of action under the DTPA fails as a matter of law because the sale of commodities option contracts is not a sale of goods under the DTPA. Appellant contends that she is a consumer within the meaning of the DTPA because the requested transaction in this case involved "goods" and/or "services." In their motion for summary judgment, appellees alleged that appellant was not a consumer as a matter of law and thus, could not maintain an action under the DTPA.

In *Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 539 (Tex.1981), the Texas Supreme Court held that a party must meet two requirements in order to qualify as a "consumer" under the DTPA. First, the party must have sought or acquired goods or services by purchase or lease, and second, the goods or services purchased or leased must form the basis of the complaint. *Id.; see also Coker v. Burghardt*, 833 S.W.2d 306, 311 (Tex.App.—Dallas 1992, writ denied); *Resolution Trust Corp. v. Westridge Court Joint Venture*, 815 S.W.2d 327, 332 (Tex. App.—Houston [1st Dist.] 1991, writ denied); TEX.BUS. & COM.CODE ANN. § 17.45(4) (Vernon 1987). Whether a party is a consumer under the DTPA is a question of law. *3Z Corp. v. Stewart Title Guar. Co.*, 851 S.W.2d 933 (Tex.App.—Beaumont 1993, writ denied); *Johnson v. Walker*, 824 S.W.2d 184, 187 (Tex. App.—Fort Worth 1991, writ denied).

The DTPA defines "goods" as "tangible chattels or real property purchased

or leased for use." TEX.BUS. & COM.CODE ANN. § 17.45(1). Tangible chattels are "those items of personal property which may be seen, weighed, measured, felt or touched." John E. Krahmer, Joe L. Lovell & Clyde Reece McCormick II, *Banks and the Texas Deceptive Trade Practices Act*, 18 TEX.TECH L.REV. 1, 11 (1987) (quoting *United Postage Corp. v. Kammeyer*, 581 S.W.2d 716, 721 (Tex.Civ.App.—Dallas 1979, no writ)). The statutory definition of "goods" indicates an obvious legislative intent to exclude the purchase of intangibles from the scope of the DTPA. *See Snyders Smart Shop v. Santi, Inc.*, 590 S.W.2d 167, 170 (Tex.Civ.App.—Corpus Christi 1979, no writ). Further, numerous courts have held that intangibles are not "goods" and thus, are excluded from coverage under the DTPA. *See Swenson v. Engelstad*, 626 F.2d 421, 428 (5th Cir.1980) (stock certificates, choses in action, and other incorporeal rights); *Riverside Nat'l Bank v. Lewis*, 603 S.W.2d 169, 174 (Tex.1980) (money); *Cowen v. First Nat'l Bank*, 94 Tex. 547, 551, 63 S.W. 532, 533 (1901) (bills and notes); *Portland Sav. & Loan Ass'n v. Bevill, Bresler & Schulman Gov't Sec., Inc.*, 619 S.W.2d 241, 245 (Tex.Civ.App.—Corpus Christi 1981, no writ) (securities and documents of title); *First State Bank, Morton v. Chesshir*, 613 S.W.2d 61, 62–63 (Tex.Civ.App.—Amarillo 1981), *rev'd on other grounds*, 620 S.W.2d 101 (Tex.1981) (certificates of deposit); *Snyders*, 590 S.W.2d at 170 (accounts receivable).

■ Appellant sought to purchase an option contract through appellees, thus, the first question we must decide is whether a commodity option contract is a "good" under the DTPA. A commodity option contract is a *right*, for a specified period of time, to buy or sell the commodity in question at a predetermined price. *See International Trading, Ltd. v. Bell*, 262 Ark. 244, 249, 556 S.W.2d 420, 422 (1977), *cert. denied*, 436 U.S. 956, 98 S.Ct. 3068, 57 L.Ed.2d 1120 (1978); COMMODITIES REGULATION at § 1.07, 22–23. (emphasis in the original) Black's defines an option as:

> **Right** of election to exercise a privilege. Contract made for consideration to keep an offer open for prescribed period. A **right,** which acts as a continuing offer, given for consideration, to purchases or lease property at an agreed upon price and terms, within a specified time. An option is an agreement which gives the optionee the power to accept an offer for a limited time. (citation omitted) An option to purchase or sell is not a contract to purchase or sell, as an optionee has the right to accept or to reject the offer, in accordance with its terms, and is not bound. (citation omitted)

BLACK'S LAW DICTIONARY 1094 (6th ed. 1990). (emphasis added) It goes on to specifically define a commodity option, i.e., a commodity option contract, as:

> A **right** that is purchased by the option holder entitling him either to buy ("call option") from or to sell ("put option") at a stated price and within a stated time an underlying physical commodity (such as a specific quantity of gold, a train carload of coffee, etc.), or a commodity futures contract relating to that commodity.

*Id.* (emphasis added)

In *First Municipal Leasing Corp. v. Blankenship, Potts, Aikman, Hagin and Stewart*, 648 S.W.2d 410, 417 (Tex.App.—Dallas 1983, writ ref'd n.r.e.), the court held that a purchase of the **right** to receive payment under the terms of a lease was not a "good" under the DTPA because it was an intangible. *First Municipal* is more analogous to the case before us than those cases cited to us by either party because it involves, as does this case, a right. We agree that a right is an intangible and therefore, does not confer consumer status under the DTPA.

■ All of the commodity option contract definitions describe it as a **right.** Therefore, it is clear that what appellant wanted to purchase was a **right** to buy oil at sometime in the future. A right is a power or privilege vested in a person to demand action or forbearance. *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1995 (1993). A right is clearly not a tangible chattel because it is not an item of personal property that can be seen, weighed, measured, felt, or touched. *See United Postage Corp. v. Kammeyer*, 581 S.W.2d 716, 721 (Tex.Civ.App.—Dallas 1979, no writ); TEX.BUS. & COM.CODE ANN.

§ 17.45(1). Thus, a commodity option contract, being merely a right, is not a "good" under the DTPA.

■ Appellant argues that a commodity option contract is different from those cases involving securities, money, accounts receivable, etc. because "an oil commodity futures contract *does involve* the purchase of a good (oil)." Again, appellant is misinterpreting what her own petition claims she attempted to purchase. Appellant sought to purchase option contracts, not futures contracts. As we explained in footnote one, there is a difference between the two. A commodities futures contract is an agreement **obligating an investor to purchase certain commodities** at a future date for a fixed price. *Morgan v. State*, 644 S.W.2d 766, 770 (Tex.App.—Dallas 1982, no writ); *see Clayton Brokerage Co. of St. Louis, Inc. v. Mouer*, 520 S.W.2d 802, 804 (Tex.Civ.App.—Austin 1975), *writ dism'd w.o.j.*, 531 S.W.2d 805 (Tex.1975). (emphasis added) A commodity option contract is merely a *right* to buy or sell the commodity at a predetermined price. *See International Trading, Ltd. v. Bell*, 262 Ark. 244, 249, 556 S.W.2d 420, 422 (Ark.1977), *cert. denied*, 436 U.S. 956, 98 S.Ct. 3068, 57 L.Ed.2d 1120 (1978); COMMODITIES REGULATION at § 1.07, 22–23. (emphasis in the original) If appellant purchased the former, she purchased oil; with the latter, she merely purchased a right to purchase oil. Appellant cannot interchange "commodities contract" with "commodities option contract." The objective of the transaction sought by appellant was to obtain a contract right, i.e., the option. If appellant had made the purchase she complained about she would not have received barrels of oil; she would have received a document giving her an option to buy futures contracts. Appellant's argument is without merit.

■■ Because a commodity option contract is not a "good," we must determine whether appellant purchased "services." "Services" are defined by the DTPA as "work, labor, or service purchased or leased for use, including services furnished in connection with the sale or repair of goods." TEX.BUS. & COM.CODE ANN. § 17.45(2). Thus, "services" include services sought or purchased outright, and services connected with the acquisition of goods. *See Woods v. Littleton*, 554 S.W.2d 662, 666 (Tex.1977); J. Edward Cole, Comment, *Stock Brokerage Firms and the Texas Deceptive Trade Practices Act*, 26 Hous.L.Rev. 321, 349–50 (1989). The term "service" is also defined as "action or use that furthers some end or purpose; conduct or performance that assists or benefits someone or something; deed useful or instrumental toward some object." *Riverside Nat'l Bank v. Lewis*, 603 S.W.2d 169, 174 (Tex.1980) (quoting *Van Zandt v. Fort Worth Press*, 359 S.W.2d 893, 895 (Tex. 1962)). The plain language of the statute indicates that if labor, work, or service is the sole purpose of a contract, it is a "service" within the scope of the DTPA. *FDIC v. Munn*, 804 F.2d 860, 863 (5th Cir.1986) (applying Texas law). The plain reading of appellant's petition shows that the purpose of the transaction she sought was not labor, work, or service. She did not allege that she sought any services from appellees. She sought only to purchase commodity option contracts. Her existing account was a non-discretionary account. All of the trades were instigated by appellant. Further, Maxey's deposition testimony shows that appellant never sought any investment advice or financial counseling. Maxey is the one who made the trades for appellant and he emphatically stated that he never sought any financial or investment advice from appellees or any other brokerage service; rather he relied on his own instincts and information. Thus, appellant clearly did not purchase any work, labor, or service.

Besides the outright purchase of goods or services, a party can attain consumer status if a service is furnished in connection with the sale of a good. TEX.BUS. & COM.CODE ANN. § 17.45(2). This part of the definition of "services" in the DTPA refers to services furnished in connection with the sale of a "good" but omits any reference to services in connection with the sale of something that is not a "good." *Munn*, 804 F.2d at 863. This omission suggests that services furnished in connection with the sale of intangibles is not a "service" under the DTPA and does not confer consumer status on a purchaser. *Id.*

However, all transactions, whether they concern tangibles or intangibles, involve human service to some extent, the cost of which is included in the price of the transaction. *Id.* Thus, it could be argued that every transaction involves the purchase of "services" under the DTPA. If this were true, services arising from the sale of intangibles would give rise to consumer status under the DTPA even though the actual purchase could not. *Id.* This would undermine the Texas Legislature's intent to exclude the sale of intangibles from DTPA coverage. *Id.* To avoid undermining the legislature's intent, some activities related to the sale of intangibles must not be "services" under the DTPA. *Id.* The question then is, when does a transaction involving intangibles confer consumer status on a party?

In *Riverside Nat'l Bank v. Lewis,* Lewis sought to borrow money from the bank to avoid repossession·of his car. 603 S.W.2d at 173. The court held that money is not a "good" under the DTPA because it is not a tangible chattel. *Id.* at 174. The court also held that because Lewis only sought to borrow money, he did not attempt to acquire "services" as contemplated by the DTPA. *Id.* Lewis alternatively argued that in the course of extending credit, the bank necessarily provided him with other services and thus, he was a consumer. *Id.* at 175. He claimed the services could have included helping him fill out the loan application, giving him financial counseling, and processing his loan. *Id.* The court agreed that these services might confer consumer status in certain cases; however, Lewis made no complaint about the quality of these collateral activities and thus, the court held that he did not meet the second prong of the test for consumer status. *Id.; see Cameron,* 618 S.W.2d at 539 (goods or services purchased or leased must form basis of complaint). Thus, the court left open the question whether activities collateral to the purchase or acquisition of an intangible can be "services" under the DTPA. *Munn,* 804 F.2d at 864.

The courts of this state have generally confined the holding in *Riverside* to cases in which the intangible is sole basis of the complaint and the central objective of the transaction. *Id.* However, in situations where the acquisition of the intangible was not the central objective of the transaction, the courts have conferred consumer status on a party. In *Flenniken v. Longview Bank & Trust Co.,* 661 S.W.2d 705, 706 (Tex.1983), the Flennikens entered into a mechanic's and materialman's lien contract with Easterwood, a contractor. Under the terms of the contract, Easterwood agreed to build a home on the Flennikens' property. *Id.* The Flennikens paid Easterwood $5,010 and executed a $42,500 note, naming him as payee. *Id.* This note was secured by a deed of trust to the property in which a vice-president of Longview Bank & Trust Co. (the Bank) was named as trustee. *Id.* Easterwood assigned the Flennikens' note and his contract lien to the Bank in order to get construction financing from the Bank. *Id.*

The Bank dispersed funds to Easterwood; however, he abandoned the project after completing only 20 percent of the work. *Id.* The Bank foreclosed on the property under the terms of the deed of trust. *Id.* The Flennikens sued the Bank under the DTPA. *Id.* The court ruled that the Flennikens were consumers under the DTPA because the central objective of the loan was the purchase of a home, a "good." *Id.* at 708. Thus, the court permitted the Flennikens to sue because the services were connected with the purchase of a "good." *Munn,* 804 F.2d at 864–65.

In *First Federal Sav. & Loan Ass'n v. Ritenour,* 704 S.W.2d 895, 897 (Tex.App.—Corpus Christi 1986, writ ref'd n.r.e.), Mr. Ritenour went to First Federal where he and his wife held a certificate of deposit by joint tenancy. He sought to prevent his wife from withdrawing funds from the certificate of deposit and was told by an employee of First Federal that he could put a "hold" on the account. *Id.* This would require both of the Ritenours to sign before any funds could be withdrawn. *Id.* After the execution of the "hold," Mrs. Ritenour, acting alone, withdrew $1,400.00, pledged the certificate of deposit for a loan of $3,000.00, and subsequently withdrew the balance in the form of a cashier's check. *Id.* Mr. Ritenour filed suit against First Federal alleging it violated the

DTPA by representing to him that a "hold" could be placed on the account. *Id.* Citing *Chesshir,* the court recognized that the mere purchase of a certificate of deposit does not confer consumer status under the DTPA. *Id.* at 899. However, the court recognized that Mr. Ritenour, unlike the Chesshirs, purchased services from the bank when he purchased the certificate of deposit and sought a "hold" on the certificate of deposit. *Id.* The court held that because Mr. Ritenour purchased financial counseling services from First Federal, collateral to the purchase of the certificate of deposit, he was entitled to consumer status. *Id.* at 900.

*Riverside, Flenniken,* and *Ritenour* represent the three categories of cases involving intangibles, from which the test for determining consumer status under the DTPA arises. *Munn,* 804 F.2d at 865. The key to the determination is whether the purchased goods or services are an objective of the transaction or merely incidental to it. *Id.* *Flenniken* represents the type of cases in which an intangible is connected to the purchase of a good; the ultimate objective of the transaction. *Id.* In that situation, the plaintiff is a consumer under the very definitions in the DTPA. *See also Knight v. International Harvester Credit Corp.,* 627 S.W.2d 382 (Tex.1982).

*Riverside* represents the category of cases in which the courts deny consumer status to the plaintiff because the sole objective of the transaction is the exchange of intangibles, e.g., present money for future money, or money for stocks. *Id.* When the basis of the complaint is the purchase of the intangible instead of any collateral services, the plaintiff is not entitled to consumer status. *Id.* *Ritenour* represents the last category: cases in which the court grants consumer status to the plaintiff even though an important objective is the purchase of an intangible. *Id.* However, to be entitled to consumer status under the *Ritenour* scenario, the plaintiff must complain about the service and it must also be an important objective of the transaction. *Id.* Thus, when a transaction's central objective is the acquisition of an intangible, Texas law requires that the collateral service be an important objective of the transaction and not merely incidental to the performance of a transaction excluded under the DTPA. *Id.; Texas Cookie Co. v. Hendricks & Peralta,* 747 S.W.2d 873, 877 (Tex.App.—Corpus Christi 1988, writ denied).

Appellant's desired transaction does not fit into the line of cases represented by *Flenniken* because we have already held that she did not seek to purchase a "good;" rather, she sought to purchase an intangible, i.e., a commodity option contract. Neither does appellant's requested purchase fit into the *Ritenour* group of cases. To the extent appellant complains about appellees' alleged misrepresentations concerning the requirements and time necessary for opening a new account, the service of opening a new account is merely ancillary to the purchase of the commodity option contract itself and thus, is not a "service" under the DTPA. *See Central Texas Hardware v. First City, Texas— Bryan, N.A.,* 810 S.W.2d 234, 237 (Tex. App.—Houston [14th Dist.] 1991, writ denied). Because such a "service" is merely incidental to the purchase, it cannot be an "important objective" of the transaction and therefore, does not confer DTPA consumer status as a matter of law.

The transaction attempted by appellant fits into that category of cases represented by *Riverside.* Appellant sought to exchange money for an commodity option contract; in other words, appellant sought to exchange an intangible for an intangible. The basis of her complaint was the failure of appellees to purchase an intangible on her behalf. She did not complain about any collateral services provided by appellees. In fact, she never even alleged that appellees provided her with any collateral services. Based on our review of the relevant caselaw, appellant was not a consumer under the DTPA as a matter of law. Appellant's fourth point of error is overruled.

Appellant is not entitled to prevail on her negligence claim as a matter of law because appellees owed her no duty. She is also precluded from recovery on her allegations concerning violations of the DTPA because she is not a consumer. Because these grounds are sufficient to entitle appellees to

summary judgment as a matter of law, it is unnecessary to address appellant's remaining points of error. The trial court's judgment in favor of appellees is affirmed.