**Opinion issued August 15, 2013**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-11-01032-CV

———————————

**STEWART & STEVENSON, LLC, Appellant**

**V.**

**BRADY FORET, Appellee**

---

**On Appeal from the 80th District Court**
**Harris County, Texas**
**Trial Court Case No. 2009-80709**

---

## MEMORANDUM OPINION

Appellant, Stewart & Stevenson, LLC, challenges the trial court's judgment, entered after a jury trial, in favor of appellee, Brady Foret, in Foret's suit against Stewart & Stevenson for negligence. In three issues, Stewart & Stevenson

contends that the trial court erred in not including in its jury charge an instruction on the law of responsible third parties,[1] awarding excessive future damages, and admitting Foret's late-filed evidence.

We affirm.

## Background

In his fourth amended petition, Foret alleged that on January 11, 2009, while he was working as a "derrick man" for Key Energy Services, LLC ("Key Energy") on a 112-foot land-based oil drilling rig ("Rig 65"), the mast collapsed, causing him to fall over eighty feet to the ground and suffer severe injuries. Rig 65 had previously been refurbished and inspected by Stewart & Stevenson at its facility in Odessa, Texas. However, Rig 65 collapsed because it was missing at least two "safety pins and retainer pins" and "critical safety equipment" that should have been provided by Stewart & Stevenson during the refurbishment. Foret, who was twenty-three years old at the time of Rig 65's collapse, "sustained severe bodily injuries, including orthopedic injuries and a traumatic brain injury, which have resulted in physical pain, mental anguish and other medical problems, including

---

[1] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 33.004 (Vernon 2012).

disfigurement and impairment." Foret sought to recover from Stewart & Stevenson $10,702,459.52 in damages.[2]

In its second amended answer, Stewart & Stevenson generally denied Foret's allegations, asserting that Foret's injuries were caused by his own negligence or the negligence of "third parties over whom [Stewart & Stevenson] had no control or right of control." Before trial, Stewart & Stevenson filed its "Motion to Designate Responsible Third Parties," seeking to designate Apache Corporation ("Apache"), Robert McLemore, and Key Energy as responsible third parties. Apache was the well site owner and operator at the time of Rig 65's collapse, and McLemore was the "company man," working for Apache and responsible for overseeing the operation. Stewart & Stevenson alleged that Apache and McLemore were negligent in "improperly using a foundation/pad that was designed and constructed for use by a different drilling rig"; failing to "design and construct a foundation/pad for the drilling rig"; "ensure that the drilling rig was properly equipped with all safety devices"; "adequately inspect the drilling rig"; and "provide a safe workplace."

After the trial court granted Stewart & Stevenson's motion, Foret filed a "Motion to Strike Designated Responsible Third Parties," arguing that the collapse

---

[2] In his original petition, Foret also brought claims against T.K. Stanley, Inc., alleging that T.K. Stanley was negligent in constructing the foundation on which the rig stood. However, Foret later non-suited his claims against T.K. Stanley.

3

of Rig 65 occurred solely because "the derrick was missing critical pins for support and essential for safety." Foret asserted that Rig 65's collapse occurred on its first use after being refurbished by Stewart & Stevenson, which had produced no evidence to indicate that Apache, McLemore, or Key Energy were responsible for his injuries. Foret also noted that Apache was found not liable for Rig 65's collapse in a companion case filed in the United States District Court for the Eastern District of Louisiana.

Stewart & Stevenson later filed a "Motion to Strike [Foret's] Late-Filed Discovery," asserting that Foret had produced to Stewart & Stevenson, after the July 1, 2011 discovery deadline, among other evidence, a medical report from Dr. Paul J. Hubbell, III on July 7, 2011 and an expert report from Terry Arnold on July 11, 2011. In her report, Arnold produced a "Life Care Plan" for Foret, opining that Foret would incur $679,296 in future medical and related needs. Stewart & Stevenson alleged that Arnold's report was based, in part, on the late-filed medical report of Hubbell, who estimated that Foret would require $259,710 in pain-management treatment.

Foret testified that on January 11, 2009, he was assigned as a 'derrickman" on Rig 65, which was then located in Golden Meadow, Louisiana. As a derrickman, Foret stood on a platform, referred to as a "monkey board," hanging off the side of Rig 65's mast, approximately eighty feet off of the ground. It was

4

his job to stand on the platform and "rack" the drill pipes on the mast, change the pipes, and ensure that they were aligned correctly. When Foret began work on Rig 65, it was "flagged," meaning that another derrickman had set up the rig to be worked on. He explained that before Rig 65 collapsed, he did not see any indication that it was tipping one way or another. And, as he was working on the monkey board, Foret suddenly heard "a loud pop" from above and felt the rig "start to collapse."

Foret's next memory was of waking up the next day in a hospital with a ventilator hooked up to his throat and his jaw wired shut because he had undergone jaw surgery while unconscious. His head, face, and right eye were swollen, making it difficult for him to see out of the eye. Foret also suffered a broken shoulder blade, a torn rotator cuff, a torn tricep, several rib fractures, a torn posterior cruciate ligament in his left knee, a collapsed lung, and several spinal fractures. At the time of trial, Foret still felt back pain, suffered from recurring knee problems, and had short-term memory loss. And he explained that he would have to undergo cognitive rehabilitation therapy for his injuries for the rest of his life.

Foret offered, and the trial court admitted, into evidence a report prepared by Francisco Godoy and Roger Craddock of Engineering Systems Incorporated ("ESI"), analyzing the cause of Rig 65's collapse. In their report, Godoy and

5

Craddock explained that Rig 65's mast consisted of a lower and an upper section, which are connected at four sets of "pawls." When the upper mast was extended, the pawls were simultaneously lifted, transferring the weight of the upper mast to the lower mast through the pawls. The pawls each contained a "link lock mechanism" that secured them to the mast with a locking, or safety, pin. Each set of pawls required its own locking pin; so, properly constructed, Rig 65 should have contained four locking pins for each set of pawls.

Godoy and Craddock opined that when the pawls were lifted on Rig 65 on the date of the collapse, it was "highly likely" that a locking pin became loose due to "mechanical vibrations or other mechanical operations." When the locking pin became loose, the "entire upper mast load, which was supported evenly on both sides, suddenly became supported" on only the "'Off Driller' side left leg" of Rig 65. As a result, the weight placed on the Off Driller side of the left leg "exceeded the maximum allowable" and caused Rig 65 to begin to buckle. Eventually, the upper pawl on the Off Driller side "slipped or skidded" off the lower pawl, the upper mast started to lean towards the left, eventually causing it to detach from the lower mast and collapse Rig 65. Godoy and Craddock concluded that: (1) if Rig 65 "had been provided with the four locking pins, it is unlikely that the collapse would have occurred"; (2) Stewart & Stevenson should have, but did not, provide Rig 65 with four locking pins during repair; (3) Stewart & Stevenson's inspectors

6

"were not well enough trained and knowledgeable"; and (4) because "the rig was able to accommodate the extra forces applied by the tautening of the guy-wires," the tautening "could not have been the cause of the buckling that caused the final collapse of the rig." At trial, Godoy testified to the same facts and conclusions.

Mark Henderson testified that he was the general manager of Stewart & Stevenson's Odessa facility beginning in November 2008. He estimated that Stewart & Stevenson finished its refurbishment of Rig 65 between April and July 2008. After Rig 65 had been shipped for on-site work in Louisiana, Stewart & Stevenson received a call from Key Energy requesting a technician to provide a "replacement pin" for Rig 65. Henderson noted that after refurbishing a mast, Stewart & Stevenson would have a quality-control technician test and certify the mast before it left the Odessa facility.

Roy Mendoza, a Stewart & Stevenson quality-control technician, testified that he conducted the final inspection of Rig 65. He noted that, if he had noticed any missing locking pins, he would have reported it on the final inspection checklist. Mendoza did not recall whether the technician made sure the locking pins fit where they were supposed to fit. He was also not aware of how many locking pins Rig 65 required, but he agreed that a Stewart & Stevenson employee must have been responsible for ensuring that all of the locking pins were in place.

7

Mendoza marked on his checklist that the mast was sufficient even though he had only seen two locking pins on it.

Jose Barron, the Stewart & Stevenson refurbishment manager in July 2008, testified that he was responsible for the employees who refurbished and certified Rig 65. He performed his own inspection, an "AESC Category 4 Inspection," of Rig 65 after the refurbishment work had been completed. Barron noted that one of the purposes of an AESC Category 4 Inspection is to ensure that the locking system is working adequately. He admitted that if Rig 65 was missing two locking pins, it would not have met industry standards. However, Barron further testified that, even with only two locking pins, the rig should have been able to carry the maximum load of 300,000 pounds, as represented by Stewart & Stevenson.

John Michael Garber, an environmental, health, and safety coordinator with Apache, testified that Apache did not perform a safety audit on Rig 65 prior to its use. After the collapse of Rig 65, he interviewed the Key Energy employees who were at the site, and they told him that there was nothing "abnormal" about the site, except that the pollution pans, which had been attached to the rig's foundation so as to store contaminated pipe segments, had begun sinking about "six to seven inches." Garber noted that Apache, through McLemore, had been informed of the sinkage the day before the collapse, and McLemore decided to take the pipes out of the pollution pans and place them back into the well.

8

Tracy Lee Duhon, a floor hand at the time of the collapse, testified that on January 8 and 9, Key Energy realized that the rig had a "misalignment problem," which it attempted to fix by using hydraulic jacks. And, on January 10, Duhon was told to go back into the well because the pollution pans had started to sink.

Joshua Matthews, who worked on Rig 65 with Foret, testified that on their first day working on the rig, they experienced some problems with the derrick "leaning too far." The problem could not be fixed with hydraulic rams, and a later attempt was made to fix the problem by pulling on the pipe with "chain and cable" in an effort to properly align it, which also did not work. By the second day, Matthews noticed some movement in the foundation of Rig 65, but he did not think that it was behaving abnormally. On the third day, January 10, Matthews was told that pipes were being moved out of the pollution pan and back into the well so "they could fix the area where the [pollution] pans were sitting." When they were down to thirty-three segments of pipe to place back into the well, Rig 65 collapsed.

Roland Duhon, a foreman for Apache, testified that after the collapse, Apache contacted T.K. Stanley, Inc., which had constructed the foundation of Rig 65, to remediate the foundation. Duhon noted that, if Rig 65 was having "pole alignment problems," he would have relied on McLemore to "shut the operation down" until "things [were] safe." He opined that Key Energy was "ultimately responsible" for inspecting Rig 65 and its foundation, and he explained that the

9

sinkage problem had to be addressed before another rig was placed on the foundation.

Clyde Ned, the "rig supervisor" of Rig 65, testified that had he known that the rig was missing its safety pins, they would have welded their own pins to the rig. However, he thought a rig with two out of four pins would be "safe to use." Ned explained that adjusting guy wires, wires which were attached to the top of Rig 65's mast to help keep it stable, should not be used to correct alignment problems. And Casey Trahan, a driller floorhand on Rig 65, testified that the crew had tried to "tighten up" the guy wires to correct the alignment problem.

Timothy Popik, Stewart & Stevenson's engineering manager, testified that Rig 65 was "having an issue with the settling from the pollution pans," which caused alignment problems and made the pipe strike the side of the foundation. Key Energy then decided to fix the alignment using hydraulic jacks and tightening the guy wires, which was not "a proper way to proceed." Tightening the guy wires produced "extra stress and tension on the mast," eventually causing the mast to tip over.

In questions one and two of its charge, the trial court asked the jury to determine whether the negligence of Stewart & Stevenson and Key Energy proximately caused Foret's injuries and, if so, to apportion a percentage of responsibility to each. At the charge conference, Stewart & Stevenson objected to

questions one and two because they did not include Apache or McLemore "as potentially responsible parties." Specifically, Stewart & Stevenson asserted that "the testimony from the experts essentially is that . . . an improper use of the guy-wires . . . led to the [collapse]." However, the trial court concluded that "it doesn't appear from the expert testimony that Apache was opined to have caused in whole or in part the collapse of the mast due to something that they did negligently," and it overruled Stewart & Stevenson's objection.

The jury found that the negligence of both Stewart & Stevenson and Key Energy caused Foret's injuries, and it apportioned 85% of the responsibility to Stewart & Stevenson and 15% to Key Energy. The jury further found that $135,145 would compensate Foret for his loss of past earning capacity, $2,000,000 for his loss of future earning capacity, $1,000,000 for his past physical pain and mental anguish, $5,000,000 for his future physical pain and mental anguish, $850,000 for his physical impairment, $1,000,000 for his future physical impairment, $69,678.53 for his past medical expenses, and $647,636 for his future medical expenses. The trial court then entered judgment on the jury's verdict, ordering Stewart & Stevenson liable for the entire damage award.

## Jury Charge

In its first issue, Stewart & Stevenson argues that the trial court erred in not asking the jury to determine whether Apache and McLemore were also responsible

11

for Foret's injuries because "the evidence and pleadings show" that their negligence caused or contributed to his injuries.

We review a trial court's decision to submit or refuse a particular jury question or instruction for an abuse of discretion. *See La.-Pac. Corp. v. Knighten*, 976 S.W.2d 674, 676 (Tex. 1998) (per curiam). When a trial court refuses to submit a requested jury question or instruction on an issue raised by the pleadings and evidence, the question on appeal is whether the request was reasonably necessary to enable the jury to render a proper verdict. *Tex. Workers' Comp. Ins. Fund v. Mandlbauer*, 34 S.W.3d 909, 912 (Tex. 2000) (per curiam) (citing TEX. R. CIV. P. 277, 278).

A trial court must submit to a jury questions, instructions, and definitions that the pleadings and evidence raise. *See* TEX. R. CIV. P. 278; *Elbaor v. Smith*, 845 S.W.2d 240, 243 (Tex. 1992). A trial court may refuse to submit a jury question only if no evidence exists to warrant its submission. *See Elbaor*, 845 S.W.2d at 243; *Brown v. Goldstein*, 685 S.W.2d 640, 641 (Tex. 1985) (citing *Garza v. Alviar*, 395 S.W.2d 821, 824 (Tex. 1965)). That is, a trial court is obligated to submit to the jury an issue if the evidence on the issue "amounts to more than a scintilla." *Roy v. Howard-Glendale Funeral Home*, 820 S.W.2d 844, 846 (Tex. App.—Houston [1st Dist.] 1991, writ denied). To rise above a scintilla, the evidence offered to prove a vital fact must do more than create a mere surmise

or suspicion of its existence. *See Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983). More than a scintilla of evidence exists when the evidence, as a whole, rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *See Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex. 1995). Conflicting evidence presents a fact question for the jury to decide. *Gunn Infiniti, Inc. v. O'Byrne*, 996 S.W.2d 854, 862 (Tex. 1999) (Baker, J., dissenting); *Brown*, 685 S.W.2d at 641–42; *Phillips Pipeline Co. v. Richardson*, 680 S.W.2d 43, 48 (Tex. App.—El Paso 1984, no writ).

The Texas Civil Practice and Remedies Code provides that,

(a)    The trier of fact, as to each cause of action asserted, shall determine the percentage of responsibility, stated in whole numbers, for the following persons with respect to each person's causing or contributing to cause in any way the harm for which recovery of damages is sought, whether by negligent act or omission, by any defective or unreasonably dangerous product, by other conduct or activity that violates an applicable legal standard, or by any combination of these:

    (1)    each claimant;

    (2)    each defendant;

    (3)    each settling person; and

    (4)    each responsible third party who has been designated under Section 33.004.

(b)     *This section does not allow a submission to the jury of a question regarding conduct by any person without sufficient evidence to support the submission.*

TEX. CIV. PRAC. & REM. CODE ANN. § 33.003 (Vernon 2012) (emphasis added).

A responsible third party is "any person who is alleged to have caused or contributed to causing in any way the harm for which recovery of damages is sought, whether by negligent act or omission, by any defective or unreasonably dangerous product, by other conduct or activity that violates an applicable legal standard, or by any combination of these." *Id.* § 33.011(6) (Vernon 2012). Therefore, a party is entitled, upon request, to a jury charge that includes a responsible third party in apportioning responsibility if sufficient evidence supports its submission. *See F.F.P. Operating Partners, L.P. v. Duenez*, 237 S.W.3d 680, 694 (Tex. 2007). Evidence is insufficient to support submission of a jury question when (1) there is a complete absence of evidence establishing a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence of a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of a vital fact. *See City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005).

Stewart & Stevenson argues that because there is evidence that Apache and McLemore were negligent in not shutting down Rig 65's operations before its collapse, supplying a faulty foundation for Rig 65, and permitting Key Energy to

14

attempt to fix the alignment problems in Rig 65 by tightening the guy wires, there is more than a scintilla of evidence that Apache and McLemore's negligence caused or contributed to the cause of Rig 65's collapse.

Foret argues that the trial court did not err in not including in its jury charge Apache and McLemore as responsible third parties because there is no evidence that Apache, McLemore's employer, "retained a contractual right of control over the work performed by subcontractors, including Key [Energy]." In support of its argument, Foret cites section 95.003 of the Texas Civil Practice and Remedies Code, which provides:

> A property owner is not liable for personal injury, death, or property damage to a contractor, subcontractor, or an employee of a contractor or subcontractor who constructs, repairs, renovates, or modifies an improvement to real property, including personal injury, death, or property damage arising from the failure to provide a safe workplace unless:
>
> (1) the property owner exercises or retains some control over the manner in which the work is performed, other than the right to order the work to start or stop or to inspect progress or receive reports; and
>
> (2) the property owner had actual knowledge of the danger or condition resulting in the personal injury, death, or property damage and failed to adequately warn.

TEX. CIV. PRAC. & REM. CODE ANN. § 95.003 (Vernon 2012). In response, Stewart & Stevenson asserts that Foret has waived his argument by not raising it at the trial court's charge conference, Louisiana law would apply instead of section 95.003,

15

and a property owner's liability under section 95.003 is irrelevant to the designation of Apache and McLemore as a responsible third parties under section 33.003.

Regardless of Chapter 95,[3] Chapter 33 requires a responsible third party to have committed a "negligent act or omission" that "caused or contributed to causing in any way the harm for which recovery of damages is sought." TEX. CIV. PRAC. & REM. CODE ANN. § 33.011(6). And the common law doctrine of negligence consists of three elements: (1) a legal duty owed by one person to another; (2) a breach of that duty; and (3) damages proximately resulting from the breach. *El Chico Corp. v. Poole*, 732 S.W.2d 306, 311 (Tex. 1987); *Rosas v. Buddie's Food Store*, 518 S.W.2d 534, 536 (Tex. 1975). The threshold inquiry in a negligence case is duty. *El Chico*, 732 S.W.2d at 311. A duty "is a legally enforceable obligation to comply with a certain standard of conduct."[4] *Hand v. Dean Witter Reynolds Inc.*, 889 S.W.2d 483, 491 (Tex. App.—Houston [14th

---

[3]     We note that Chapter 95 simply served to codify Texas's common-law approach to premises-owner liability set out in *Redinger v. Living, Inc.*, 689 S.W.2d 415, 418 (Tex. 1985). *See also Johnston v. Oiltanking Hous., L.P.*, 367 S.W.3d 412, 416 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Chapter 95 further limited a premises owner's liability by requiring a plaintiff to prove that the owner had knowledge of a dangerous condition on the premises, an issue not presented in this case. *See Johnson*, 367 S.W.3d at 416.

[4]     Stewart & Stevenson does not contend that Louisiana law on the issue of duty in negligence cases is any different than Texas law.

16

Dist.] 1994, writ denied) (citing *Way v. Boy Scouts of Am.*, 856 S.W.2d 230, 233 (Tex. App.—Dallas 1993, writ denied)).

Generally, a premises owner or general contractor does not have a duty to see that a subcontractor performs work in a safe manner.[5] *Abarca v. Scott Morgan Residential, Inc.*, 305 S.W.3d 110, 126 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (citing *Redinger v. Living, Inc.*, 689 S.W.2d 415, 418 (Tex. 1985)). However, a limited duty arises if a premises owner or general contractor retains control over a subcontractor's methods of work or operative details to the point that the subcontractor is not entirely free to do the work in his own way. *Abarca*, 305 S.W.3d at 126 (citing *Koch Ref. Co. v. Chapa*, 11 S.W.3d 153, 154 (Tex. 1999)). The premises owner or general contractor's "duty of reasonable care is commensurate with the control it retains" over the subcontractor. *Hoechst–Celanese Corp. v. Mendez*, 967 S.W.2d 354, 355 (Tex. 1998) (per curiam). General supervisory control that does not relate to the activity causing the injury is not sufficient to create a duty. *Abarca*, 305 S.W.3d at 126. However, "an employer who gives on-site orders or provides detailed instructions on the means or methods to carry out a work order owes the independent contractor employee a

---

[5] A premises owner and a general contractor both owe the same duties to an independent contractor's employees; therefore, cases considering these duties are used interchangeably. *Koch Ref. Co. v. Chapa*, 11 S.W.3d 153, 155 n.1 (Tex. 1999) (per curiam).

17

duty of reasonable care to protect him from work-related hazards." *Hoechst–Celanese*, 967 S.W.2d at 357.

"Control can be established in two ways: by (1) a contractual right of control or (2) an exercise of actual control." *Abarca*, 305 S.W.3d at 122 (citing *Ellwood Tex. Forge Corp. v. Jones*, 214 S.W.3d 693, 700 (Tex. App.—Houston [14th Dist.] 2007, pet. denied)). To be liable for exercising actual control, a premises owner or general contractor must have had the right to control the means, methods, or details of the independent contractor's work to the extent that the independent contractor was not entirely free to do the work its own way. *Abarca*, 305 S.W.3d at 124. The control must relate to the injury that the negligence causes. *Id.* It is not enough that the owner has the right to order the work to stop and start or to inspect progress or receive reports. *Id.* Nor is it enough to recommend a safe manner for the independent contractor's employees to perform the work. *Id.*

Stewart & Stevenson first asserts that Apache and McLemore were negligent in "refus[ing] to shut down the operations when [they] should have," and it cites a manual, which was admitted into evidence, entitled, "Recommended Practice for Use and Procedures for Inspection, Maintenance, and Repair of Drilling and Well Servicing Structures," authored by the American Petroleum Institute ("API"). Among recommended practices, API states,

18

Rig foundations and guywire tensions should be checked daily. The following conditions are reason to discontinue operations until the cause of the discrepancy is located and corrected:

a. There is large relative movement between the mast support structure and the rotary/setback support structure when the slips are set and the load is removed from the mast, or vice versa.

b. The empty traveling block does not hang over or near the well center and/or the mast support structure is not level.

c. The mast support structure or substructure subsides more on one side than the other with the application of load, and/or the guywire on one side becomes noticeably tighter when the tension in the guywire on the opposite side becomes noticeably less.

Stewart & Stevenson also refers to a University of Texas textbook entitled, "Safety on the Rig," which states, "The service companies have their own safety rules that must be observed by rig employees, but it is the operator's responsibility to ensure that the service company's operations do not endanger the drilling operation or personnel." And there is evidence that McLemore had the ability to shut down operations at the rig if he deemed them unsafe. For example, Robert Duhon, Apache's foreman, testified that McLemore, as the "company man," was expected to ensure that the project would not proceed "until things [were] safe."

However, as noted above, the law is clear that the right of a general contractor or premises owner to order work to start or stop, inspect progress, or receive reports is insufficient to create a duty under either the common law or

19

Chapter 95. *See, e.g., Redinger*, 689 S.W.2d 418; *Johnston v. Oiltanking Hous., L.P.*, 367 S.W.3d 412, 417, 419 (Tex. App.—Houston [14th Dist.] 2012, no pet.); *see also Yeager v. Drillers, Inc.*, 930 S.W.2d 112, 115–17 (Tex. App.—Houston [1st Dist.] 1996, no writ) (holding company man and employer entitled to summary judgment on independent contractor's negligent claim where company man "did not direct [the independent contractor's] work"). Thus, Apache and McLemore's general right to shut down operations at Rig 65 could not have given rise to a duty, and this cannot constitute a basis for considering them as responsible third parties. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 33.003(b).

Stewart & Stevenson next asserts that Apache and McLemore were negligent in "suppl[ying] a faulty foundation" for Rig 65. Clyde Ned, Key Energy's "rig supervisor" at the site, did testify that it was the company man's responsibility, "or the company [he was] working for," to ensure that Rig 65's foundation was safe. And there is evidence that the pollution pans sunk, which possibly contributed to causing Rig 65 to lean. For example, McLemore testified that he told Garber, Apache's environmental, health, and safety coordinator, that he was "having an issue with [the] pollution pans" because "they were sinking." However, it is undisputed that another independent contractor, T.K. Stanley, built the foundation for Rig 65.

20

Furthermore, an independent contractor is generally expected "to take into account any open and obvious premises defects in deciding how the work should be done, what equipment to use in doing it, and whether its workers need any warning." *See, e.g., Gen. Elec. Co. v. Moritz*, 257 S.W.3d 211, 215–16 (Tex. 2008). As asserted in Stewart & Stevenson's brief, Key Energy was aware "that the foundation was sinking, particularly around the pollution pans." Ned testified that he noticed "a little sinkage" in the foundation, and Damian McGee, a Key Energy employee, testified that he had "noticed some sinking where the tubing pans were." Duhon testified that she could see the pollution pans sinking "about a foot," causing the rig to move "a little bit." And Mathews testified that he could also see that the pollution pans were sinking. Finally, Garber testified that McLemore decided "together" with Joe Vale, Key Energy's superintendent, to pull pipes out of the pollution pans in an attempt to remediate the sinking problem. However, such an awareness and agreement did not give rise to a duty on the part of Apache and McLemore. *See id.* And the evidence conclusively establishes that Apache did not construct the foundation for Rig 65 and any problem with the foundation sinking was obvious to Key Energy, which was included in the trial court's charge as a potentially responsible third party.

Finally, Stewart & Stevenson asserts that Apache and McLemore were negligent in "lett[ing] Key [Energy] misuse the guy wires in a boneheaded

21

response to the leaning rig." A general contractor's right of control must relate to the injury the negligence causes. *Abarca*, 305 S.W.3d at 124. To prove that the general contractor breached an applicable duty of care, a nexus must be shown between the general contractor's retained control and the condition or activity that caused the injury. *See Shell Oil Co. v. Khan*, 138 S.W.3d 288, 294 (Tex. 2004); *Hoechst-Celanese*, 967 S.W.2d at 357; *see also Clayton W. Williams, Jr., Inc. v. Olivo*, 952 S.W.2d 523, 528 (Tex. 1997). Stated another way, a general contractor's duty is commensurate with the control it retains over the independent contractor's work. *Hoechst-Celanese*, 967 S.W.2d at 357; *Mendez*, 967 S.W.2d at 357. It is not enough to show that the general contractor controlled one aspect of the independent contractor's activities if its employee's injury arose from another. *Khan*, 138 S.W.3d at 294.

Here, although several witnesses testified that it was improper to adjust the guy wires to correct a rig misalignment, there is no evidence in the record that Apache and McLemore directed or controlled Key Energy's use of the guy wires. Stewart & Stevenson cites us only to Little's testimony that McLemore "knew what was going on with regard to this guy wire movement." However, this testimony does establish that Apache and McLemore had control over the "operative details" surrounding Key Energy's use of the guy wires. *See, e.g*, *Johnston*, 367 S.W.3d at 419–20 (holding employer's right to control timing and

22

sequence of work had no relation with plaintiff's injuries); *Painter v. Momentum Energy Corp.*, 271 S.W.3d 388, 406–07 (Tex. App.—El Paso 2008, pet. denied) (holding no evidence company man had control over independent contractor's activities in removing "rotating head" from rig, which caused plaintiff's injuries).

In sum, for the trial court to have asked the jury to determine whether Apache and McLemore were also responsible for Foret's injuries, there must be evidence that Apache and McLemore committed a "negligent act or omission" that "caused or contributed to causing in any way the harm for which recovery of damages is sought." TEX. CIV. PRAC. & REM. CODE ANN. § 33.011(6). There is no evidence in the record that Apache and McLemore breached a duty to Foret by not stopping operations, by "suppl[ying] a faulty foundation," or by allowing Key Energy to misuse the guy wires. Thus, there is no evidence that Apache and McLemore committed a "negligent act or omission" that caused Foret's damages. *See El Chico*, 732 S.W.2d at 311 (stating that threshold inquiry in any negligence case is duty). Accordingly, we hold that the trial court did not err in not including in its jury charge the issue of whether Apache or McLemore were possible responsible third parties under Chapter 33.

We overrule Stewart & Stevenson's first issue.

23

**Damages**

In its second issue, Stewart & Stevenson argues that the jury's awards of $5,000,000 for future pain and mental anguish, $1,000,000 for future physical impairment, and $2,000,000 for future earning capacity are excessive and "far exceed the norm for this kind of case" because it "does not involve burns, lost limbs, or the kinds of injuries that often generate very high verdicts."

*Standard of Review*

We review a claim that a damages award is excessive for factual sufficiency of the evidence. *See Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406 (Tex. 1998). When faced with a factual-sufficiency challenge to a jury's finding, we must consider and weigh all of the evidence, not just that evidence which supports the finding. *See Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996). Because we are not a fact finder, we may set aside the finding only if it is so contrary to the overwhelming weight of the evidence that the finding is clearly wrong and manifestly unjust. *Mar. Overseas Corp.*, 971 S.W.2d at 407.

Due to the nature of personal injury damages, i.e., because they are unliquidated and incapable of measurement by any certain standard, a jury has broad discretion in fixing the amount of the award. *See Weidner v. Sanchez*, 14 S.W.3d 353, 372 (Tex. App.—Houston [14th Dist.] 2000, no pet.); *J. Wigglesworth Co. v. Peeples*, 985 S.W.2d 659, 665–66 (Tex. App.—Fort Worth

24

1999, pet. denied); *see also Pittsburgh Corning Corp. v. Walters*, 1 S.W.3d 759, 781 (Tex. App.—Corpus Christi 1999, pet. denied) ("[D]eterminations of pain and suffering damages cannot be neatly confined to mathematical certainties."). However, that discretion is limited in that it must enjoy evidentiary support; in other words, "[j]uries cannot simply pick a number and put it in the blank." *Saenz v. Fid. & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex. 1996).

***Future Pain and Mental Anguish***

Stewart and Stevenson first asserts that the evidence regarding future mental anguish is "non-existent" and the evidence regarding future pain is "limited" and "not nearly enough to justify" the jury's award of $5,000,000.

To recover damages for mental anguish, a plaintiff must produce direct evidence of the nature, duration, and severity of the mental anguish, establishing a substantial disruption in his daily routine. *See City of Tyler v. Likes*, 962 S.W.2d 489, 495 (Tex. 1997) (quoting *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995)); *Verinakis v. Med. Profiles, Inc.*, 987 S.W.2d 90, 95 (Tex. App.—Houston [14th Dist.] 1998, pet. denied). "As a general rule, evidence to establish 'adequate details to assess mental anguish claims' can be demonstrated by 'the claimants' own testimony, that of third parties, or that of experts.'" *N.N. v. Inst. for Rehab. & Research,* 234 S.W.3d 1, 9 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (*quoting Parkway,* 901 S.W.2d at 444).

25

The presence or absence of pain, either physical or mental, is an inherently subjective question. *HCRA of Tex., Inc. v. Johnston*, 178 S.W.3d 861, 871 (Tex. App.—Fort Worth 2005, no pet.); *Dollison v. Hayes*, 79 S.W.3d 246, 249 (Tex. App.—Texarkana 2002, no pet.). No objective measures exist for analyzing pain and suffering damages. *HCRA,* 178 S.W.3d at 871; *see also Hicks v. Ricardo,* 834 S.W.2d 587, 591 (Tex. App.—Houston [1st Dist.] 1992, no writ). Thus, once the existence of some pain and suffering has been established, there is no objective way to measure the adequacy of the amount awarded as compensation. *HCRA,* 178 S.W.3d at 871; *Dawson v. Briggs,* 107 S.W.3d 739, 751 (Tex. App.—Fort Worth 2003, no pet.).

Here, in regard to Foret's mental anguish, Dr. Bradley Bartholomew, a neurosurgeon who examined and treated Foret, testified that, as a result of falling from between sixty to eighty feet to the ground, Foret suffered a "closed head injury" that resulted in "traumatic brain injury." Testing conducted after the fall revealed that Foret had performed lower than average in attention concentration and intellectual, language, memory, and motor functioning. And Bartholomew described Foret as suffering from permanent "cognitive deficits." Dr. Richard Pollock, a neuropsychologist, concluded that Foret had "suffered a significant brain injury" and was "experiencing a significant depression." He opined that Foret "has a cognitive disorder," meaning that he has "problems with memory and

26

processing information," and "very significant clinical depression." Pollock concluded that these issues would be "permanent and lifelong," and Foret will "have to work with those deficits for the rest of his life."

Foret's wife, Megan Foret, testified that since his injury, Foret often forgets where he is going when he is driving, forgets to turn off the stove after cooking, and cannot bathe his child because he will forget the child is in the bathtub. As a result, Foret feels like "he's less than a man" because "he can't help out as much as he used to." She explained that Foret cries "a lot" and the crying "is getting worse." Megan did not think it was realistic for them to have a second child because of the attention she now has to give to her husband. Likewise, Foret testified that since his injury, he is not "the man that" he "should be" for Megan, and he suffers from anxiety and depression.

In regard to pain, Dr. Bartholomew testified that Foret suffered from fractures in his spine and kyphosis, or an abnormal "bending" of the spine that may "continue to cause pain." Bartholomew opined that Foret will have "permanent pain" in his back with permanent restrictions on "repetitive bending, stooping, crawling, twisting, turning" and picking up objects weighing more than twenty-five pounds. Foret testified that he still suffers from knee and back pain. And Bartholomew opined that Foret would need "long-term pain management" for the rest of his life.

27

From this record, we conclude that Foret presented direct evidence of his physical pain and mental anguish from which the jury could have reasonably concluded that he will continue to suffer substantial disruptions in his daily routine.[6] *See City of Tyler v. Likes*, 962 S.W.2d at 495. Accordingly, we hold that the jury's award of $5,000,000 dollars for future pain and mental anguish is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *See Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998).

*Future Physical Impairment*

Stewart & Stevenson next argues that because the jury's award of $1,000,000 in future physical impairment is excessive, this Court should suggest a remittitur of 90% of the award.

"Physical impairment, sometimes called loss of enjoyment of life, encompasses the loss of the injured party's former lifestyle." *Gen. Motors Corp. v. Burry*, 203 S.W.3d 514, 554 (Tex. App.—Fort Worth 2006, pet. denied); *see*

---

[6] Stewart & Stevenson cites us to several cases in which plaintiffs received lesser damage awards, arguing that they demonstrate that the damage awards in this case are excessive. However, because there is no certain standard by which personal injury damages can be measured, "each case must stand on its own facts and circumstances." *See, e.g., Star Hous., Inc. v. Shevack*, 886 S.W.2d 414, 421 (Tex. App.—Houston [1st Dist.] 1994, writ denied). And we note that Stewart & Stevenson does not challenge the jury's award of $1,000,000 dollars for two-and-a-half years of past physical pain and mental suffering; nor does it challenge the testimony of Doctors Bartholomew and Pollock, who opined that Foret will have "permanent" and "lifelong" issues as a result of his injuries.

28

*Doctor v. Pardue,* 186 S.W.3d 4, 18 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) (quoting *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 772 (Tex. 2003)).  A plaintiff generally must show that his physical-impairment damages are substantial and extend beyond any pain, suffering, mental anguish, lost wages or diminished earning capacity.  *Burry,* 203 S.W.3d at 555; *see Golden Eagle Archery, Inc.,* 116 S.W.3d at 772 (indicating that "it would be appropriate to advise the jury [by instruction] that it may consider as a factor loss of enjoyment of life. But the jury should be instructed that the effect of any physical impairment must be substantial and extend beyond any pain, suffering, mental anguish, lost wages or diminished earning capacity and that a claimant should not be compensated more than once for the same elements of loss or injury.").

Here, Megan testified that Foret was one of the most "lively people" she had known before his injuries, and he spent his spare time hunting, fishing, and helping his father repair their cars and homes.  She noted that after he sustained his injuries, she sees Foret cry "because of all things that he used to be able to do that he can't do now, such as helping his dad."  Foret was "very independent" before his injuries but now she has "to do everything" for him.  Foret testified that because of his chronic back pain, he is no longer "physically able to do the kinds of things" that he did prior to being injured.  Specifically, Foret can no longer go deer hunting or work on cars with his father.  And he can only play with his son for

29

short periods of time before his back begins to hurt. Foret is also unable to hold his son for longer than five or ten minutes, and, as his son grows, Foret will no longer be able to hold him at all.

From this evidence, the jury could have reasonably concluded that Foret would suffer a substantial loss of enjoyment of life and loss of his former lifestyle. *See, e.g., Figueroa v. Davis*, 318 S.W.3d 53, 64–65 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (upholding award for past and future physical impairment for plaintiff with dental injuries because he subsequently had to limit number and types of food he ate and "could not eat some of the foods that he loved" for several years); *Burry*, 203 S.W.3d at 549–55 (upholding $3,500,000 award for future physical impairment for mother who suffered brain damage and could no longer read to her children, drive a car, or live without supervision); *see also Marquette Transp. Co. Gulf-Inland, LLC v. Jackson*, No. 01-10-01025-CV, 2012 WL 1454476, at *13–14 (Tex. App.—Houston [1st Dist.] Apr. 26, 2012, no pet.) (not designated for publication) (holding evidence plaintiff "permanently limited" and no longer "able to participate in the same activities that he pursued before he was injured, including everything from standing in order to cook and clean to playing basketball" sufficient to support jury's award of $500,000 for future physical impairment). Accordingly, we hold that the jury's award of $1,000,000 for future

30

physical impairment is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust.

## *Future Earning Capacity*

Finally, Stewart & Stevenson asserts that the jury's award of $2,000,000 in future earning capacity is excessive.

Lost earning capacity is an assessment of a plaintiff's capacity to earn a livelihood prior to injury and the extent to which that capacity is impaired by the injury. *Scott's Marina at Lake Grapevine, Ltd. v. Brown*, 365 S.W.3d 146, 158–59 (Tex. App.—Amarillo 2012, pet. denied). Lost earning capacity is not measured by what a person actually earned before an injury, but by the person's *capacity* to earn, even if he had never worked in that capacity in the past. *Id.*; *Gen. Motors Corp. v. Burry*, 203 S.W.3d 514, 553 (Tex. App.—Fort Worth 2006, pet. denied). Proof of loss of earning capacity is always uncertain and is left largely to the discretion of the jury. *Rigdon Marine Corp. v. Roberts*, 270 S.W.3d 220, 232 (Tex. App.—Texarkana 2008, pet. denied). Nevertheless, to support an award of damages for lost earning capacity, a plaintiff must present evidence sufficient to permit a jury to reasonably measure earning capacity in monetary terms. *Tagle v. Galvan*, 155 S.W.3d 510, 519–20 (Tex. App.—San Antonio 2004, no pet.); *Durham Transp. Co., v. Beettner*, 201 S.W.3d 859, 864 (Tex. App.—Waco 2006, pet. denied). Non-exclusive factors that may be considered in determining lost

earning capacity include evidence of past earnings and the plaintiff's stamina, efficiency, ability to work with pain, and work-life expectancy. *Big Bird Tree Servs. v. Gallegos*, 365 S.W.3d 173, 178 (Tex. App.—Dallas 2012, pet. denied); *Tagle*, 155 S.W.3d at 519.

Thomas Mayor, an economist, testified that he reviewed Foret's tax returns, his employment and payroll records, and "a whole host of these general statistical studies." Mayor interviewed Foret and noted that he "was very young" and "was really on track to be a high income earner for someone with his education and at his age." In his expert report, entered into evidence, Mayor opined that Foret would lose $1,725,068 in future earning capacity, without taking into account lost career advancement, which would total $2,587,602 in future earning capacity. He further explained that "if the medical evidence indicates that he will be able to return to work and earn some percentage of his former pay, then that percentage should be subtracted in order to arrive at the appropriate mitigated loss." In the case that Foret could "work in a light duty capacity," Mayor opined that he would lose $1,069,542, without considering career advancement, and $1,940,702 when considering career advancement.

Stewart & Stevenson asserts that Mayor's conclusions "rested on the critical assumption that [Foret] flatly cannot work again" and such evidence "is so weak as to make the damage award clearly wrong and unjust." However, as noted in his

32

report, Mayor calculated a loss in future earning capacity of $1,940,702, taking into account the possibility of future employment, a calculation not far from the jury's award of $2,000,000 dollars. Furthermore, there is evidence in the record that Foret may be unemployable for the rest of his life. Dr. Bartholomew noted,

> The problem is he can't do physical labor anymore because of his spine injuries, so that would have to put him in more of a desk-type job. And I don't see how, with cognitive deficits, he's going to be able to get gainful employment with these deficits. So the answer is no, I don't see him being employable."

Likewise, Dr. Pollock opined that "the odds are against" Foret finding competitive employment again.

Furthermore, Viola Lopez, a vocational rehabilitation expert, testified that she performed a "vocational assessment" of Foret. She concluded that because of Foret's "chronic pain," the "restrictions [doctors] have placed on him," and "the neuro cognitive problems of even day-to-day activities," she did not believe Foret would be able to find "competitive employment." She also noted that Foret had "never done light work, work in an office or clerical." Thus, she did not think it was "reasonable to think he can do that."

From this evidence, we cannot conclude that the jury's award of $2,000,000 for loss of future earning capacity is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. Accordingly, we hold that

33

the evidence is factually sufficient to support the jury's award of $2,000,000 for loss of future earning capacity.

Stewart & Stevenson also argues that the jury's awards of future damages are "overlapping" because "all his future damages stem from the physical and emotional pain that will curtail his work and personal life in the future to some extent." However, as established above, factually-sufficient evidence supports the jury's awards individually for future pain and mental anguish, future physical impairment, and loss of future earning capacity. Accordingly, we further hold that the evidence is factually sufficient to support the jury's entire $8,000,000 dollar award for future damages.

We overrule Stewart & Stevenson's second issue.

**Late-Filed Discovery**

In its third issue, Stewart & Stevenson argues that the trial court erred in admitting into evidence Foret's late-filed discovery responses, namely, the life care plan by Terry Arnold, and medical information supplied by Dr. Paul Hubbell, a pain management specialist. Stewart & Stevenson asserts that Arnold's life care plan "unexpectedly injected about $680,000 in future economic damages that Foret had never requested before."

When a party has not timely made, amended, or supplemented a discovery response, the party may not introduce into evidence the material or information

that was not timely disclosed unless the court finds that there was good cause for the failure to timely make the discovery response or the failure to timely make the discovery response will not unfairly surprise or unfairly prejudice the other parties. TEX. R. CIV. P. 193.6(a). A disclosure is presumed to be untimely if it was made less than thirty days before trial. *Id.* 193.5(b). The party seeking to introduce the evidence has the burden of establishing good cause or the lack of unfair surprise or prejudice. *Id.* 193.6(b). And the trial court has discretion to determine whether the party has met this burden. *Alvarado v. Farah Mfg. Co.*, 830 S.W.2d 911, 914 (Tex. 1992); *Dolenz v. State Bar of Tex.*, 72 S.W.3d 385, 387 (Tex. App.—Dallas 2001, no pet.).

Here, on July 11, 2011, Stewart & Stevenson filed a "Motion to Strike [Foret's] Late-Filed Discovery," in which it asserted that Foret had produced to Stewart & Stevenson, after the July 1, 2011 discovery deadline, among other evidence, Hubbell's expert report on July 7, 2011 and Arnold's life care management plan on July 11, 2011. In Arnold's "Life Care Plan," she estimated that Foret would incur $679,296 in future medical and related needs. Stewart & Stevenson alleged that the expert report was based, in part, on the late-filed medical report from Dr. Hubbell, who had estimated that Foret required $259,710 in pain management treatment. In his response to Stewart & Stevenson's motion, Foret argued that Stewart & Stevenson was not unfairly prejudiced by the late

production of Hubbell's report because he was timely designated as an expert and his medical records were produced upon receipt. In regard to Arnold's report, Foret asserted that he timely designated Arnold and Stewart & Stevenson had Arnold's report when it deposed her on July 12, 2011.

Stewart & Stevenson argues that it was "deliberately shortchange[ed]" in its ability to adequately depose Dr. Hubbell and Arnold concerning the substance of their reports. However, we note that on July 13, 2011, two days after it had filed its motion to strike, and one day after it had deposed Arnold, Stewart & Stevenson filed a "Motion to Assign This Case to the Jury Docket, or, In the Alternative, Motion for Continuance." In that motion, Stewart & Stevenson asked the trial court to set the jury trial start on July 18, 2011. In the alternative, Stewart & Stevenson requested a continuance only if the trial court denied its "request to have [the] matter set on the jury docket for the two-week period July 18, 2011 – July 29, 2011." On July 19, 2011, in response to Foret's motion to strike its motion for continuance, Stewart & Stevenson again asserted that it "seeks to maintain the current jury trial." Only in the alternative to the trial court's denial of its motion to assign the case did Stewart & Stevenson assert a "need for additional discovery" due to Foret's "barrage of late-filed discovery."

Here, Stewart & Stevenson was able to depose Arnold after receiving her report, Foret produced Dr. Hubbell's report as soon as it became available, and,

most importantly, Stewart & Stevenson repeatedly insisted on going to trial on July 18. Thus, the trial court could have reasonably concluded that Stewart & Stevenson was not unfairly prejudiced by the late production of Arnold's and Hubbell's reports. *See, e.g., Wigfall v. Tex. Dep't of Criminal Justice*, 137 S.W.3d 268, 274 (Tex. App.—Houston [1st Dist.] 2004, no pet.) (holding that trial court did not abuse its discretion in not excluding late-designated expert witnesses where movant did not request continuance or show how "delay left him unable to conduct his own discovery"). Accordingly, we hold that the trial court did not err in admitting the reports into evidence.

We overrule Stewart & Stevenson's third issue.

## Conclusion

We affirm the judgment of the trial court.

Terry Jennings
Justice

Panel consists of Justices Jennings, Brown, and Huddle.